PRODUCCIONES TOMMY MUÑIZ, INC., demandante y recu-
rrente, *v.* COMITÉ ORGANIZADOR DE LOS VIII JUEGOS
PANAMERICANOS (COPAN) demandado y recurrido; EL
ESTADO LIBRE ASOCIADO DE PUERTO RICO, interventor y
recurrido.

*Números:* R-79-169,    *Resueltos:* 9 de noviembre de 1982
R-79-176

*Rubén T. Nigaglioni,* de *Nigaglioni, Palou & Ledesma,* abogado de la recurrente; *Wilfredo A. Géigel,* abogado del recurrido; *Eliezer Aldarondo Ortiz,* abogado del interventor E.L.A.

EL JUEZ ASOCIADO SEÑOR TORRES RIGUAL emitió la opinión del Tribunal.

Cuestiones fundamentales relacionadas con los requisitos que integran la oferta como elemento esencial para la perfección del contrato y con la obligación de resarcir los perjuicios causados por la terminación injustificada de los tratos preliminares, reclaman el ejercicio de nuestra función revisora en este caso. Es de rigor hacer un resumen de los hechos pertinentes, según aparecen de las determinaciones de hechos del tribunal de instancia, para una comprensión adecuada de estos asuntos y de nuestra decisión.

El Sr. Arturo Carrión, presidente del Comité Organizador de los VIII Juegos Panamericanos (COPAN), se reunió con distintos productores de televisión con el propósito de discutir la venta de los derechos exclusivos para la transmisión de los juegos en Puerto Rico y les invitó a someter licitaciones. Producciones Tommy Muñiz, Inc. (Muñiz) resultó el mejor postor entre los tres productores que sometieron ofertas, al ofrecer por los derechos exclusivos de radio y televisión en Puerto Rico, la cantidad de $200,000 y la instalación de un centro de televisión ". . . que estará dispuesto y será adecuado para negociar su uso con otros mercados".

El 16 de enero de 1979 la Junta de Subasta de COPAN

notificó por escrito a Muñiz que se le había adjudicado la subasta, advirtiéndole que: "En breve se le someterán, para su firma, los documentos escritos ratificando [*sic*] los acuerdos entre ustedes y COPAN-79." En efecto, el 22 de enero, COPAN presentó a Muñiz el documento escrito para su firma, pero éste lo objetó porque contenía cláusulas onerosas que no estaban incluidas en su licitación. Específicamente, objetó que el centro de televisión que COPAN concebía era mucho más complejo y costoso que lo que había tenido en mente. Muñiz entendía que el centro de televisión era para la transmisión de los juegos en Puerto Rico, mientras que Carrión entendía que era tanto para la transmisión local como para la internacional. Esta conclusión del tribunal de instancia parece confligir con la propia oferta de Muñiz, pero las partes no la han impugnado, por lo que por ahora nos limitamos a señalar la discrepancia.

Con motivo de la discrepancia COPAN y Muñiz iniciaron negociaciones en el curso de las cuales se produjeron siete borradores de contrato. En el cuarto borrador, acordaron entrar en una empresa común para la instalación del centro. El Comité Ejecutivo de COPAN, en su reunión del 24 de enero, consideró este borrador y lo encontró, según la minuta de esa fecha, ". . . apropiado y solamente quedó pendiente la versión final que va a ser muy parecida a la versión actual". No obstante, surgieron dificultades por razón del alto precio del equipo que el centro de televisión requería, por lo que Muñiz se comunicó con Carrión y acordó con éste que si la empresa común no pudiera llevarse a cabo, Muñiz pagaría a COPAN la cantidad adicional de $25,000. El acuerdo se concretó en el quinto borrador que también se discutió en la reunión de COPAN y su comité ejecutivo, celebrada el 22 de febrero de 1979.(1) En esa reunión

---

(1) Es con motivo de este quinto borrador que Muñiz declaró que Carrión le manifestó que tenía un contrato y que siguiera adelante. Pero Carrión negó que hiciera tales manifestaciones, y el tribunal no hizo conclusión alguna sobre este extremo.

COPAN trazó unas directrices que fueron incluidas por Carrión en el sexto borrador. De la discusión de este documento surgió el sétimo proyecto, el cual eliminó definitivamente la empresa común, debido a las dificultades surgidas con respecto al equipo técnico que se necesitaba para la transmisión internacional. Este borrador fue preparado por Muñiz, quien lo entregó el 6 de marzo a Carrión, junto con una carta explicativa.

El 13 de marzo, Carrión informó al Gobernador de Puerto Rico que se estaba negociando un contrato con Muñiz. En esa ocasión el Gobernador indicó a Carrión que las emisoras del gobierno estaban disponibles y que le gustaría que se explorara la posibilidad de transmitir los juegos por esas emisoras. Al día siguiente Carrión informó a Muñiz que, por instrucciones del Gobernador, el contrato no se firmaría.

No obstante, no es sino hasta el 20 de marzo que COPAN desaprueba el sétimo borrador y ordena a Carrión a suspender las negociaciones con Muñiz, autorizándolo a comenzar negociaciones formales con el Departamento de Instrucción Pública para determinar la posibilidad y conveniencia de que los juegos se transmitieran por las emisoras del Pueblo de Puerto Rico. Todo ello, a pesar de que ya desde 1977 Carrión había rechazado la posibilidad de transmitir los juegos por dichas emisoras y así se había informado a la directora, Dra. Elsi Calero de Martínez. En ningún momento la doctora Calero de Martínez o el Secretario de Instrucción Pública efectuaron gestión alguna ante COPAN para variar el criterio de Carrión. Es después de adjudicada la subasta a Muñiz que el Secretario de Instrucción manifestó a Carrión su interés en transmitir los juegos por las emisoras del gobierno, pero éste reiteró su criterio.

Con motivo de la referida resolución del 20 de marzo, Carrión invitó entonces al Secretario de Instrucción Pública a reunirse con él para discutir todo lo relativo a la transmisión de los juegos, pero el Secretario no respondió a la

invitación; tampoco los funcionarios de las emisoras del gobierno se reunieron con Carrión. No obstante, el 21 de marzo, horas antes de que se certificara la referida resolución, el Gobernador anunció en rueda de prensa que los juegos se transmitirían por las emisoras del gobierno.

En orden a estos hechos y otros que no son pertinentes a las cuestiones en controversia, el tribunal de instancia denegó el auto de *injunction* permanente solicitado por Muñiz para obligar a COPAN a cumplir con la adjudicación de subasta, por entender que no se había perfeccionado un contrato entre las partes y resolvió que COPAN venía obligado a indemnizar a Muñiz por los perjuicios causados y los gastos incurridos durante las negociaciones.

Ambas partes solicitaron la revisión de la sentencia dictada por el tribunal de instancia; Muñiz porque su oferta fue incondicionalmente aceptada por COPAN mediante la carta de adjudicación de subasta fechada el 16 de enero de 1979, lo que, a su juicio, tuvo el efecto de perfeccionar un contrato entre ellos y COPAN, porque consideró que no se debe imponer responsabilidad bajo la doctrina de culpa *in contrahendo*. Consolidamos los recursos y acordamos revisar.[2]

·I

Ciertamente, la aceptación de la oferta es el procedimiento normal para el perfeccionamiento del contrato. En esa forma se manifiesta el consentimiento de las partes, que como sabemos, es requisito esencial para la existencia del contrato. Así lo preceptúa el Art. 1214 del Código Civil cuando dispone que: "El consentimiento se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato." 31 L.P.R.A. sec. 3401.

---

[2] Denegamos, además, la solicitud en auxilio de jurisdicción presentada por Muñiz. Véase *Prod. Tommy Muñiz, Inc.* v. *COPAN*, 108 D.P.R. 699 (1979).

■ Es decir, el vínculo obligacional entre las partes surge del acuerdo de voluntades que se manifiesta con la oferta y la aceptación. Pero para que ello sea así, es indispensable que la oferta reúna determinados requisitos entre los cuales se destaca, por su importancia en el caso de autos, el que la declaración de voluntad del oferente sea completa; que contenga todos los elementos esenciales del contrato que se estimen necesarios, de manera que quede el contrato perfeccionado con la mera aceptación de la oferta. L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 193; J. Puig Brutau, *Fundamentos de Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 180, n. 14; J. L. Lacruz Berdejo, *Elementos de Derecho Civil*, Barcelona, Ed. Bosch, 1977, T. II, Vol. 2, págs. 74–75; J. Castán Tobeñas, *Derecho Civil Español, Común y Foral*, 11ma ed., Madrid, Ed. Reus, 1974, T. III, pág. 533; E. Vázquez Bote, *Derecho Civil en Puerto Rico*, Barcelona, Ediciones Jurídicas, 1973, T. III, Vol. 1, págs. 481–482. Puig Brutau subraya que "[s]ólo es verdadera oferta la que puede generar el contrato con la simple aceptación". *Op. cit.*, pág. 180, n. 14. En el mismo tenor se pronuncia Moreno Quesada:

> *Otro requisito para la existencia de verdadera oferta es que en ella se contengan los elementos esenciales del negocio que se trata de realizar, . . . de tal modo que por la aceptación, es decir, por la mera adhesión de la persona a la que va dirigida, pueda surgir el contrato*; y esto es porque, siendo la oferta con la aceptación, lo fundamental del contrato, si con su concurrencia no fuera suficiente para su formación y hubiera que recurrir a un nuevo acuerdo, el valor de la primitiva propuesta no sería el de verdadera oferta, sino el de trato preliminar encaminado a la formulación de la misma. *Así, tendremos oferta cuando en ella se contengan los elementos esenciales para la formación del contrato, de tal modo que no sea necesario para saber su contenido un nuevo acuerdo* de las partes cuando se haya producido la aceptación. B. Moreno Quesada, *La Oferta de Contrato*, Barcelona, Colección Nereo, 1963, págs. 64–65. (Énfasis suplido.)

La norma imperante en el Derecho norteamericano coincide plenamente con la doctrina española a este respecto. W. H. E. Jaeger, *Willinston on Contracts*, 3ra ed., Mount Kisco, New York, Baker, Voorhis & Co., Inc., 1957, Vol. I, Sec. 37, pág. 108; A. Corbin, *Corbin on Contracts*, St. Paul, Minnesota, West Publishing Co., 1963, Vol. I, Sec. 11, pág. 26.

El principio afirmado en *Cancel* v. *Municipio de San Juan*, 101 D.P.R. 296 (1973), al efecto de que la adjudicación de la buena pro a un licitador crea vínculo contractual, arranca evidentemente del supuesto de una oferta que contenga todos los elementos esenciales para la conclusión del contrato; de una oferta verdadera, como afirma Puig Brutau. Y éste es el punto crucial que en este caso requiere dilucidación.

La oferta de Muñiz para obtener el derecho exclusivo de transmisión de los juegos en Puerto Rico consistía de: 1) el pago de la cantidad de $200,000, y 2) el establecimiento de un centro de televisión que estaría disponible y sería adecuado para negociar su uso con otros mercados. El centro de televisión constituía, pues, uno de los elementos esenciales de la oferta cuyo contenido debía quedar claramente definido y concretado por las partes para que su aceptación por COPAN pudiera generar un vínculo contractual. Por supuesto, no era necesario que Muñiz incluyera en su declaración de voluntad todas las especificaciones del centro de televisión si éstas quedaban entendidas por haber sido objeto, por ejemplo, de discusión en conversaciones preliminares a la subasta y, por consiguiente, ellos las conocían y tenían claro su concepto. En tal caso, las conversaciones preliminares complementaban la imprecisión e insuficiencia de la frase "adecuado para negociar su uso con otros mercados", impartiéndole contenido cabal a la oferta para que el contrato quedara perfeccionado con la simple aceptación de COPAN en la carta del 16 de enero de 1979.

La prueba, sin embargo, no revela el contenido preciso

de las conversaciones de Carrión con los productores de televisión para la celebración de la subasta. Razonablemente, puede inferirse que se discutió el interés de COPAN en que se estableciera un centro de televisión, pues Muñiz lo incluyó en su oferta como parte del precio, lo que indica que estaba consciente de ese interés. Pero no surge del récord que las partes tuviesen un entendimiento claro sobre lo que en esencia debía ser dicho centro, de manera que la sucinta expresión "adecuado para negociar su uso con otros mercados" fuera suficiente para transmitir una idea concreta y definitiva de su significado. El asunto era uno, por demás, técnico y complejo, por lo que tampoco puede inferirse su entendimiento sin base alguna en el récord. Es por eso que el tribunal de instancia concluyó en su sentencia que no estaba claro cuál era el concepto de centro de televisión comprendido en la oferta de Muñiz.

En efecto, desde el primer momento, a partir de la referida carta de aceptación del 16 de enero de 1979, se puso de manifiesto una seria discrepancia sobre cómo cada una de las partes entendía la oferta. El propio comportamiento de las partes al discutir y redactar siete proyectos diferentes en ánimo de conciliar sus intereses avalan la conclusión de que las partes no tenían claro el concepto de centro de televisión, objeto del contrato, cuando se hizo la oferta.

La ausencia de ese entendimiento claro, previo a la declaración de voluntad de Muñiz, requería que el concepto de centro de televisión, comprendido en la frase "adecuado para negociar su uso con otros mercados", fuera definido claramente y concretado en la oferta, de manera que ésta pudiera generar fuerza vinculante. Sin una oferta completa no podía haber una aceptación definitiva que perfeccionara el contrato.

Las negociaciones posteriores a la adjudicación de la subasta tampoco lograron producir un acuerdo de voluntades sobre el centro de televisión, que pudiera generar un vínculo obligacional entre las partes. Quizá pudiera argüirse

que el acuerdo plasmado en el· cuarto borrador para la creación de una empresa común tuvo el consentimiento de ambas partes, ya que, en efecto, el Comité Ejecutivo de COPAN en su reunión del 24 de enero de 1979 lo consideró "apropiado". En el contexto de las negociaciones hasta ese momento, y si tomamos en cuenta que en la minuta de esa reunión se expresó, además, que solo quedaba pendiente la versión final "que va a ser muy parecida a la actual", podía razonablemente interpretarse esta expresión como una aceptación del contrato. Pero debe recordarse que surgieron dificultades por razón del precio del equipo del centro de televisión y que, con motivo de ello, Muñiz se volvió a comunicar con Carrión y acordaron entonces que si la empresa común no pudiera llevarse a cabo, Muñiz pagaría a COPAN la cantidad adicional de $25,000. No se acordó cómo ni quién determinaría que la empresa común no era factible, por lo que, lógicamente, era necesario un acuerdo posterior para la sustitución de la empresa común por la cantidad de $25,000. Por otro lado, no hay prueba en el récord de que COPAN impartiera su consentimiento a este acuerdo, sino que meramente lo discutió en su reunión del 22 de febrero y con motivo del mismo trazó unas directrices que desconocemos.

Las anteriores consideraciones nos convencen de que no incurrió en error el tribunal de instancia al concluir que nunca se perfeccionó un contrato entre las partes.

.II

La inexistencia del vínculo contractual no dispone, sin embargo, del planteamiento sobre la responsabilidad de COPAN, como consecuencia de los hechos que hemos reseñado. El planteamiento propiamente consiste en lo siguiente: ¿Es COPAN legalmente responsable de los daños sufridos por Muñiz, por causa de su retiro de las negociaciones? Si lo es, ¿cuál es la naturaleza de esa responsabilidad? ¿Es de tipo contractual, extracontractual o sui géne-

526

ris? La solución a estas interrogantes nos lleva al complejo ámbito de la responsabilidad en la fase precontractual, tema que ha suscitado variados enfoques y no poca controversia entre los tratadistas y expositores de la doctrina científica. Díez-Picazo, *op. cit.*, págs. 188–192; Puig Brutau, *op. cit.*, págs. 226–230; Lacruz Berdejo, *op. cit.*, págs. 77–80; Castán Tobeñas, *op. cit.*, págs. 530–532; Moreno Quesada, *op. cit.*, págs. 32–58, 195–209; Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed., Madrid, Ediciones Pirámide, 1977, T. III, pág. 380; M. Alonso Pérez, *La Responsabilidad Precontractual*, 47 Rev. Crítica de Derecho Inmobiliario 859 (julio–diciembre 1971); J. L. De Los Mozos, *El Principio de la Buena Fe*, Barcelona, Ed. Bosch, 1965, págs. 222–224; Mazeaud y Tunc, *Tratado teórico y práctico de la responsabilidad civil delictual y contractual*, 5ta ed. (trad. por Luis Alcalá-Zamora y Castillo), Buenos Aires, Ediciones Jurídicas Europa-América, 1962, Vol. II, T. I, págs. 164–169; M. Albaladejo, *Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1975, T. II, Vol. 1, págs. 317–319; J. Santos Briz, *La Contratación Privada*, Madrid, Ed. Montecorvo, 1966, págs. 97–100; L. Ennecerus, *Tratado de Derecho Civil* (trad. y comentarios de Pérez y Alguer), Barcelona, Ed. Bosch, 1954, T. II. Vol. I, págs. 231–232; P. F. Entenza Escobar, *La Responsabilidad Precontractual en Derecho Puertorriqueño*, 7 Rev. Der. Puertorriqueño 105 (1963); Vázquez Bote, *op. cit.*, págs. 474–481.

■ Sabido es que nadie está obligado a contratar. Este principio basilar del Derecho de obligaciones tiene como consecuencia que las partes no están obligadas a proseguir con las negociaciones hasta perfeccionar el contrato, sino que están en libertad de contraer el vínculo o de retirarse, según convenga a sus mejores intereses. Albaladejo, *op. cit.*, pág. 317; Puig Brutau, *op. cit.*, pág. 226.

Las negociaciones preliminares, sin embargo, generan una relación de carácter social que impone a las partes el deber de comportarse de acuerdo con la buena fe, que, como

bien señala Díez-Picazo, "no impera solamente en las relaciones jurídicas ya establecidas o constituidas, sino también en las relaciones derivadas de un simple contacto social". *Op. cit.*, pág. 191.

No obstante las dificultades que la naturaleza de la cuestión plantea, los autores admiten plenamente la existencia de responsabilidad por la terminación injustificada de los tratos preliminares. Moreno Quesada, *op. cit.*, págs. 41–42; Puig Brutau, *op. cit.*, pág. 228. La discusión se ha centrado más bien en el fundamento jurídico de esta responsabilidad. Nos limitaremos por el momento a destacar los matices más definidos de tan interesante cuestión.

El primero en plantear el problema fue el insigne jurista alemán Von Ihering, quien, basándose en el Derecho romano, atribuyó carácter contractual a la culpa que se produjese en el proceso de las negociaciones. R. Von Ihering, *De la culpa incontrahendo*, en Oeuvres Choisies, 2da ed. francesa, París, 1893, núm. 15, pág. 9, citado por Moreno Quesada, *op. cit.*, pág. 200. Mas no parece lógico derivar una responsabilidad contractual de los tratos preliminares si no hay contrato. Esta fase precontractual no crea vínculo jurídico hasta que culmine en el perfeccionamiento del contrato. Mazeaud y Tunc afirman categóricamente: "No hay responsabilidad contractual sin un contrato." *Op. cit.*, pág. 166. En iguales términos se pronuncian Díez-Picazo, *op. cit.*, pág. 190; Santos Briz, *op. cit.*, pág. 98; y Entenza Escobar, *op. cit.*, pág. 105.

Otros, como Menéndez Pidal, han intentado a través de los principios generales del Derecho, extender la doctrina de responsabilidad objetiva a los tratos preliminares,[3] criterio al que se opone Moreno Quesada fundado en que la aplicación de los principios de responsabilidad objetiva está reservada a los supuestos que expresamente estén consagrados en la Ley. Moreno Quesada, *op. cit.*, pág. 43.

---

[3] Apéndice a la obra de Hilsenrad, *Las Obligaciones Precontractuales*, ed. esp., Madrid, s.f., citado en Moreno Quesada, *op. cit.*, págs. 37–38.

■ El fundamento doctrinal más arraigado se asienta en la responsabilidad extracontractual regulada por el Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, equivalente al Art. 1902 del Código Civil español. Moreno Quesada, *op. cit.*, págs. 43 y 44; Alonso Pérez, *op. cit.*, pág. 912; Santos Briz, *op. cit.*, pág. 99; Albaladejo, *op. cit.*, pág. 319. En efecto, el grueso de la doctrina considera hecho ilícito el rompimiento injustificado de las negociaciones, porque constituye un quebrantamiento de la buena fe que, como sabemos, penetra todo nuestro ordenamiento positivo. La buena fe impone a las partes un deber de lealtad recíproca en las negociaciones. En palabras de Alonso Pérez:

> La buena fe . . . impone a las partes que tratan o negocian un arquetipo de conducta social, lealtad y fidelidad a la palabra dada . . . y consiste en que cada parte de la relación pre-contractual se entreg[ue] confiadamente a la conducta leal de la otra. Fía y confía en que ésta no le engañará. . . . Las partes tienen la obligación de comportarse según la buena fe en el sentido de que a ella incumbe la carga de una lealtad recíproca de conducta socialmente valorable y exigible. *Op. cit.*, págs. 888–889.

Puede objetarse, sin embargo, que el rompimiento injustificado de los tratos no es más que el ejercicio de un derecho, ya que las partes están en plena libertad de contraer el vínculo o de no proseguir con las negociaciones. A este respecto, Díez-Picazo señala que "no cabe hablar de acto ilícito en supuestos de una lícita retirada de una negociación". *Op. cit.*, pág. 191.

No obstante, sabemos que el ejercicio de un derecho no está exento de responsabilidad cuando se realiza en forma abusiva. Nuestro ordenamiento recoge ya el concepto jurídico de abuso del derecho como fuente de responsabilidad. Al respecto expresamos en *Velilla* v. *Pueblo Supermarkets, Inc.*, 111 D.P.R. 585, 588 (1981), que: "Es ilegítimo el ejercicio de un derecho cuando el titular excede manifiestamente los límites impuestos por la buena fe o por el fin social o

económico de ese derecho." Véase, además, *Soriano Tavárez v. Rivera Anaya*, 108 D.P.R. 663 (1979). Moreno Quesada propugna una orientación analítica similar:

> Con arreglo a esta dirección que marca la jurisprudencia, y teniendo en cuenta que si bien el desistimiento de continuar los tratos preliminares está comprendido dentro del ejercicio del derecho que autoriza a las partes a retirarse de ellos, no es menos cierto que el hecho de la arbitrariedad o injustificación de ese desistimiento, cuando razonablemente se pudiese esperar la conclusión de un acuerdo, constituye una actuación abusiva de ese derecho, por lo que pueden encuadrarse esos supuestos dentro del ámbito del artículo 1.902 del Código Civil. *Op. cit.*, págs. 45–46.

En nuestra jurisdicción, Entenza Escobar reafirmó la aplicabilidad de la norma general de daños, contenida en el Art. 1802 del Código Civil:

> Alrededor del artículo 1.802 puede fundarse la imposición de una responsabilidad de tipo extracontractual ("culpa aquiliana") a quien actúa culposa y dañosamente durante los tratos preliminares. En efecto, aparentemente, ahí se encuentran presentes todos los elementos del delito civil o *"tort"*: acción u omisión culposa, resultado de daño, relación de causalidad entre la conducta y el resultado. *Op. cit.*, pág. 107.

Las negociaciones que anteceden al contrato pueden ser de variada índole y, por tanto, la responsabilidad precontractual puede surgir en diferentes supuestos. Así, cuando la conducta de una de las partes es por su propia naturaleza culposa, dolosa o fraudulenta —como cuando uno de los contratantes oculta al otro su falta de capacidad para contratar— o se mantienen los tratos sin propósito de contratar, sólo para obtener información confidencial del negocio, o se inician los tratos, no con el propósito de realizarlos, sino de obtener alguna ventaja para negociar con un tercero, o cuando por culpa de una de las partes el negocio celebrado resulte ineficaz. En fin, la amplia gama de supuestos sobre los que puede asentarse la responsabilidad precontractual hace necesario que en el análisis del pro-

blema se considere qué figura jurídica —culpa, dolo, fraude, buena fe, abuso del derecho u otros principios generales del derecho— responde más adecuadamente como fundamento jurídico para la solución del caso.[4]

Debemos ahora determinar qué constituye el rompimiento injustificado o arbitrario de la negociación. Ya vimos que no hay obligación de culminar los tratos y, en consecuencia, el rompimiento por sí mismo no es suficiente para asentar la responsabilidad. Es preciso considerar las circunstancias del rompimiento, específicamente: (1) el desarrollo de las negociaciones, (2) cómo comenzaron, (3) el curso que siguieron, (4) la conducta de las partes durante su transcurso, (5) la etapa en que se produjo el rompimiento, y (6) las expectativas razonables de las partes en la conclusión del contrato, así como cualquier otra circunstancia pertinente conforme los hechos del caso sometidos a escrutinio judicial.

El Derecho norteamericano no está ajeno a los valores subyacentes que encierra el principio de la buena fe y la doctrina de la culpa *in contrahendo*. La jurisprudencia reconoce la responsabilidad precontractual en supuestos similares a los que en el Derecho civil aplica las nociones de la buena fe y la culpa *in contrahendo*, mediante las figuras jurídicas del *promissory estoppel, Hoffman* v. *Red Owl Stores, Inc.*, 133 N.W.2d 267 (1965); *Chrysler Corporation* v. *Quimby*, 144 A.2d 123 (1958); y *negligent misrepresentation, Guilbert* v. *Phillips Petroleum Company*, 503 F.2d 587 (6th Cir. 1974). Véase, además, F. Kessler y E. Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study*, 77 Harv. L. Rev. 401, 448 (1964).

---

[4] Moreno Quesada separa, a los fines del análisis, la responsabilidad en dos períodos a los que atribuye distintos significados: la fase de negociación con anterioridad a la oferta y que culmina en la formulación de ésta, y la fase posterior a la oferta. *Op. cit.*, pág. 195.

## III

Conforme los criterios enunciados, examinemos los hechos antes reseñados para determinar si COPAN incurrió en responsabilidad al romper las negociaciones y, en consecuencia, debe reparar los perjuicios causados a Muñiz.

Los hechos revelan que COPAN no manifestó su voluntad con la claridad y minuciosidad que la naturaleza del negocio exigía, lo que provocó en Muñiz la errónea creencia de que la adjudicación de la subasta había perfeccionado el contrato y, por tanto, podía continuar sin pérdida de tiempo los preparativos para transmitir los juegos. Indudablemente, esta creencia se fortaleció al notificarle COPAN que "[e]n breve se le someterán, para su firma, los documentos escritos ratificando [*sic*] los acuerdos entre ustedes y COPAN-79". En el curso de las negociaciones sobre el centro de televisión se prepararon siete borradores de contrato, unos por COPAN y otros por Muñiz, que fueron objeto de consideración. El borrador número 4 fue aceptado en principio por COPAN y el número 5 tuvo el endoso de Carrión. El curso de estas negociaciones crearon en Muñiz una expectativa razonable de que el contrato habría de concluirse. Al fin y al cabo había sido el licitador que había obtenido la buena pro y ya desde el 1977 COPAN había descartado transmitir los juegos por las emisoras del gobierno, por lo que era razonable confiar que se llegaría a un acuerdo sobre el centro de televisión, que satisficiera los intereses legítimos de ambas partes.

Por otro lado, COPAN no adujo razón fundada para el rompimiento abrupto de las negociaciones.

Todo lo anterior demuestra, sin la más leve duda, que el rompimiento fue injustificado y que la conducta de COPAN en las circunstancias apuntadas no sólo quebrantó la buena fe impuesta por las relaciones precontractuales, sino que, además, constituyó un abuso del ejercicio de su derecho a retirarse.

*Se dictará sentencia que confirme la recurrida y se devuelve el caso al tribunal de instancia para ulteriores procedimientos.*

El Juez Asociado Señor Dávila se une a la opinión en voto separado. El Juez Asociado Señor Rebollo López se une a la opinión en las partes I y II y disiente en la parte III en opinión separada. El Juez Asociado Señor Díaz Cruz disiente con opinión y el Juez Asociado Señor Negrón García se inhibió.

—O—

Opinión concurrente y disidente del Juez Asociado Señor Rebollo López.

Estoy en completo acuerdo con lo expresado en la primera parte de la opinión del Tribunal a los efectos de que la aceptación de la oferta es el procedimiento normal para el perfeccionamiento de un contrato, ya que el vínculo obligacional entre las partes surge del acuerdo de voluntades que se manifiesta con la oferta y la aceptación, pero que, para poder ser así, es indispensable que la oferta contenga todos los elementos esenciales para la conclusión del contrato; en otras palabras, que una vez aceptada la oferta, por ser ésta una "oferta verdadera", no hay necesidad de ulteriores negociaciones entre las partes.

Entiendo que es correcta la conclusión a la que llega la opinión del Tribunal a los efectos de que, atendidos los hechos particulares del presente caso, nunca se perfeccionó un contrato entre las partes.

Concurro, igualmente, con la norma que la citada opinión establece, a los efectos de que la *retirada injustificada* por una parte de unas negociaciones puede generar responsabilidad, no empece el hecho de que las partes envueltas en ellas no están obligadas a proseguir con las mismas hasta perfeccionar el contrato, ya que en unas negociaciones siempre existe la libertad de obligarse en

definitiva o de retirarse, según mejor convenga a dichas partes.

Entiendo que es una norma saludable aquella que propone que el dolo, el fraude y la mala fe estén ausentes de una negociación; permitir que estén presentes en el trato profesional y en el tráfico comercial diario, a mi juicio, sería permitir que la ley que impere en esta sociedad sea la ley del más listo e inescrupuloso. Tenemos un deber ineludible de velar porque no sea así.

Estoy de acuerdo también en que, como el rompimiento en unas negociaciones por sí solo no genera responsabilidad, es mandatorio, para determinar si se impone o no responsabilidad a la parte que se retiró, examinar las circunstancias en que se produjo el rompimiento, tales como: (1) la forma en que comenzaron las negociaciones; (2) el desarrollo de las negociaciones y el curso que siguieron éstas; (3) la conducta observada por las partes durante ese curso o desarrollo; (4) la etapa en que se produjo el rompimiento; y (5) la expectativa razonable, de la "otra" parte, en relación con la culminación del contrato.

Lamento muy de veras, sin embargo, el no estar de acuerdo con la aplicación de la norma que hace la opinión del Tribunal a los hechos específicos del presente caso y, por lo tanto, me veo obligado a disentir.

Lo primero que hay que tener presente en este caso, es que Producciones Tommy Muñiz, Inc., representada en esas negociaciones por su presidente, el Sr. Tommy Muñiz, es una corporación compuesta por personas que han estado ligadas al mundo y negocio de las producciones de espectáculos por muchos años. En otras palabras, se trata de una entidad y de personas con mucha experiencia en este campo y que no sólo cuentan con dicha experiencia, sino con el asesoramiento necesario —técnico y legal— para llevar a cabo dicha producción.

1. *¿Cómo comenzaron las negociaciones?*

Como bien señala la opinión del Tribunal, las mismas

comenzaron mediante conversaciones que sostuviera el Sr. Arturo Carrión, Presidente del Comité Organizador de los VIII Juegos Panamericanos (COPAN), con distintos productores de televisión, para invitarlos a que sometieran licitaciones.

2 y 3. *El desarrollo y curso que siguieron dichas negociaciones y la conducta observada por las partes.*

Tenemos que Producciones Tommy Muñiz, Inc., resultó ser el mejor postor al ofrecer, por los derechos exclusivos de radio y televisión en Puerto Rico, la suma de $200,000 y la instalación de un centro de televisión *"que estará dispuesto y será adecuado para negociar su uso con otros mercados".*

Nótese que la oferta de Producciones Tommy Muñiz, Inc. se divide y se compone de *dos* partes: (a) la suma de $200,000 por los derechos exclusivos para transmitir por radio y televisión en Puerto Rico, y (b) la instalación del citado centro de televisión, el cual sería adecuado para negociar su uso *con otros mercados.*

Una vez que COPAN "adjudica" a la mencionada corporación la subasta y le hace entrega de los correspondientes documentos, *surge la gran dificultad, que estuvo presente a través de todas las negociaciones.* ¿Cuál? Producciones Tommy Muñiz, Inc. objeta los documentos porque, alegadamente, el centro de televisión en relación con el cual ellos se obligaron sólo se usaría para la transmisión de los juegos en Puerto Rico.

Resulta sumamente difícil de aceptar, aun para un lego en la materia de producción de espectáculos, que la frase "estará dispuesto y será adecuado para negociar su uso con otros mercados" pueda ser interpretada en la forma y manera que Producciones Tommy Muñiz, Inc. pretendía que se hiciera, una vez le fue adjudicada la subasta.

Debemos tener presente que en los VIII Juegos Panamericanos participaban, además de Puerto Rico, numerosos países de América que estaban interesados en la transmisión por televisión de dichos juegos. *La frase "otros mercados" no*

*puede tener otra interpretación que "otros países"*; no podemos llegar al ridículo e interpretarla como que se refería, digamos, además del "mercado" de San Juan, a "mercados" tales como los de Vieques o Culebra. Hace muchos años el ex Juez Asociado de este Tribunal, Hon. Raúl Serrano Geyls, expresó que "Los jueces no debemos, después de todo, ser tan inocentes como para creer [lo] que nadie más creería". *Pueblo* v. *Luciano Arroyo*, 83 D.P.R. 573, 582 (1961).

Debido al "tranque" en las negociaciones las partes se reúnen una y otra vez y hacen y rehacen *siete* borradores de contrato. En otras palabras, COPAN, ante el "tranque" causado por la absurda interpretación que a sus propias palabras pretendió darle Producciones Tommy Muñiz, Inc., pacientemente negocia durante dos meses (del 22 de enero al 14 de marzo de 1979) con Producciones Tommy Muñiz, Inc., haciendo un esfuerzo por llegar a un acuerdo, propósito que no se pudo lograr.

¿Quién causó el tranque? ¿Quién actúa y negocia de mala fe? Nos parece que la contestación es obvia: Producciones Tommy Muñiz, Inc.

4. *La etapa en que se produjo el rompimiento.*

Al cabo de dos meses de negociaciones y encontrándose todavía las partes "en el mismo sitio que cuando empezaron" —por cuanto todavía se encontraban discutiendo sobre el "centro de televisión"— COPAN decide retirarse de las negociaciones con Producciones Tommy Muñiz, Inc. y utilizar las facilidades de la estación de televisión del Gobierno de Puerto Rico.

Se argumenta y se recalca —aparentemente con el propósito de "demostrar" que las negociaciones fueron rotas en forma injustificada y arbitraria por COPAN— el hecho de que el Gobernador de Puerto Rico, Hon. Carlos Romero Barceló, tomó injerencia en el asunto antes de que COPAN se retirara de las negociaciones con Producciones Tommy Muñiz, Inc.

No podemos olvidar que, a pesar de que COPAN es una corporación privada con fines no pecuniarios, en el desarrollo, la celebración y el éxito que pudieran tener los VIII Juegos Panamericanos estaba empeñado el honor, el prestigio, la palabra y la imagen del Pueblo de Puerto Rico.

Ante una situación de hechos en que al final de dos meses de negociaciones las partes están como cuando empezaron, ello debido a que una de las partes (Producciones Tommy Muñiz, Inc.) pretende interpretar el ofrecimiento formal que hiciera, en una forma absurda; en que la fecha de la celebración de los juegos ya se acerca; en que dichos juegos están revestidos de un gran interés público, aparte de que en los mismos están envueltos fondos públicos, ¿es sorprendente el hecho de que el Gobernador de Puerto Rico interviniera en el asunto? Entendemos que no; era su deber hacerlo así.

5. *Expectativa razonable de Producciones Tommy Muñiz, Inc. en relación con la culminación del contrato.*

Ante una situación en que es la propia Producciones Tommy Muñiz, Inc. la que no sólo causa el "tranque" en las negociaciones, sino que las prolonga durante dos meses, ¿se le debe conceder daños por razón de que tenía una "expectativa razonable" de que se culminara el contrato? Sostenemos que no.

La opinión del Tribunal expresa que por razón de que Producciones Tommy Muñiz, Inc. había sido el licitador que había obtenido la buena pro "era razonable confiar que se llegaría a un acuerdo. . .".

Ese mismo hecho parece ser lo que motivó a Producciones Tommy Muñiz, Inc., una vez se le "adjudicó" la subasta, a cambiar su ofrecimiento: una vez obtuvo la buena pro, parece ser que intentó situarse y negociar con COPAN desde una "posición de poder".

La sentencia que dictara el tribunal de instancia en el presente caso debe ser revocada en tanto y en cuanto

determina que Producciones Tommy Muñiz, Inc. tiene derecho a daños y perjuicios.

—O—

Voto disidente del Juez Asociado Señor Díaz Cruz.

Por regla general, y como la llaman Díez-Picazo y Antonio Gullón,[1] en línea de principios, la ruptura de una negociación no origina ninguna responsabilidad. "Las partes, por el hecho de haber tratado preliminarmente la formación de un contrato, en manera alguna están obligadas a su conclusión." Toda vez que la negociación se da en un plano de confianza que no debe ser defraudada, de romperse los tratos sin justificación, hay que indemnizar a la parte que confiaba honestamente en la conclusión del acuerdo *los gastos* en que haya incurrido (pago de asesores, desplazamientos, interés del dinero conseguido para cumplir la prestación a la que le obligaría el contrato, etc.). Así de limitada estaría la responsabilidad de COPAN, aun si aceptáramos la conclusión expresada en la opinión, pág. 531, de que "[e]l curso de estas negociaciones crearon en Muñiz una expectativa razonable de que el contrato habría de concluirse". Tal expectativa necesariamente debió sufrir una erosión gradual hacia la extinción al fracasar el acuerdo a lo largo de siete proyectos, sin que se progresara ni aun cuando quien alentaba la expectativa ofreció $25,000 adicionales sobre los $200,000 de oferta original. La ruptura unilateral genera responsabilidad sólo si el estado de las negociaciones era avanzado "por haberse logrado acuerdos importantes que hacía confiar lícitamente a la parte perjudicada la celebración del contrato".[2] Castán Tobeñas se une a este criterio de limitación a *gastos* al dictaminar:

---

[1] *Sistema de Derecho Civil*, 3ra ed., 1980, Vol. II, pág. 74.

[2] Díez-Picazo y Gullón, *op. cit.*, pág. 75.

> Ha de estimarse, como apuntan Ruggiero y Maroi, que en la fase de formación del contrato hay ya para las partes un deber de lealtad recíproca y buena fe. Por regla general, la ruptura de los tratos no traerá consigo ninguna responsabilidad; mas si llegadas las convenciones a un punto en que podía razonablemente esperarse la conclusión del contrato, una de las partes se vuelve atrás sin motivo justificado, está obligada a responder a la otra, por su arbitrario proceder, de los gastos que haya hecho y de las pérdidas patrimoniales que haya sufrido. *Derecho Civil Español, Común y Foral*, 10ma ed., 1967, T. 3, pág. 469.

Entre Muñiz y COPAN nada se avanzó en torno a la provisión por el primero del centro de televisión.

Se reconoce derecho a indemnización de *daños y perjuicios* bajo el Art. 1802 C.C. cuando se rompen las negociaciones de *mala fe*, pero ya éste es caso de excepción en que se sanciona la falta de conducta honesta y leal del que va a la negociación sin propósito legítimo, como obtener conocimiento de técnicas de producción de la otra parte, u oculta a ésta su falta de capacidad para contratar, o para aparentar la solidez financiera de su empresa o desviar su contraparte de otros negocios que el culposo no desea que se lleven a cabo. La prueba no coloca a COPAN en ninguna de éstas o análoga posición de *fraude* o mala fe contra Muñiz.

Se impone esta distinción entre: (1) responsabilidad limitada a *gastos* en caso de fundada *expectativa* de final formación del contrato; y (2) responsabilidad en *daños y perjuicios* de quien actúa de *mala fe*, porque de exigir igual responsabilidad en uno y otro caso se produciría un temor de riesgo en los contratantes que frenaría y hasta enervaría la deseable fluidez y libertad de acción en toda la etapa precontractual. En palabras de Díez-Picazo y Gullón[3] al citar a De Cupis, "al establecer un régimen general de responsabilidad, se impone a las partes tal cautela y circunspección que *se impide enérgicamente la vida del tráfico*". (Énfasis nuestro.)

---

[3] *Op. cit.*, pág. 75.

Debe preocuparnos la incorporación a nuestra jurisprudencia de la doctrina propuesta para gobernar la contratación, habida cuenta de la densa negociación precontractual que ésta requiere en la actualidad, y su impacto adormecedor en la actividad económica del país. Aun en distinta apreciación de los hechos y desatención de las autoridades citadas, la decisión del Tribunal debería limitarse a otorgar *gastos* de expectativa a Producciones Tommy Muñiz, Inc.

—O—

Voto separado del Juez Asociado Señor Dávila.

Al unirme a la opinión del Tribunal deseo expresar el alcance que a mi juicio tiene el precepto que hoy sentamos.

No cabe malinterpretar la expresión del Tribunal al efecto de que, establecidas las negociaciones previas al contrato, no pueden los negociadores abandonarlas sin incurrir en un "quebrantamiento de la buena fe". No pretendemos decir que se requiere justa causa para ejercer el derecho a no contratar, que es esencialísimo corolario de nuestro derecho de contrato consensual. Es sólo el retiro abusivo de la negociación el acto que demanda reparación. Véanse F. Kessler y E. Fine, *Culpa in Contrahendo, Bargaining in Good Faith, and Freedom of Contract: A Comparative Study,* 77 Harv. L. Rev. 401 (1964).

El retiro de COPAN de sus negociaciones con Muñiz se torna abusivo, no por no tener justificación, sino por frustrar las expectativas que COPAN, con sus actos al negociar, en forma razonable, despertó en Muñiz. Durante las negociaciones, COPAN nunca manifestó a Muñiz que la suerte de sus esfuerzos no dependería de la vinculación de sus desacuerdos y conflictos, sino del criterio, no dudamos, sano y bien intencionado de partes ajenas a la negociación, cual era el señor Gobernador de Puerto Rico. Si, en cambio, COPAN le hubiese participado a Muñiz, durante el curso de sus tratos, que el criterio último sería el del Gobernador, difícilmente podría concebirse base alguna para tachar de

abusivo el proceder de COPAN. El interés del Gobernador era clarísimo. Después de todo, el gobierno enjugaba buena parte del coste de los juegos. Mas, la prueba no revela que COPAN hiciera depender sus negociaciones con Muñiz del criterio del Ejecutivo. Tal y como se ha presentado ante nos, el récord revela que el contrato se perfeccionaría de poderse zanjar las ya reducidas discrepancias entre COPAN y Muñiz. La sorpresiva introducción de elementos, hasta entonces ocultos, para apartarse de súbito de tan avanzada gestión de negociación, constituye un proceder abusivo de parte de COPAN, que demanda reparación.

Creo menester expresarme también sobre el tipo de daño que debe resarcirse en estos casos. Sirve de clara ilustración el criterio de la Corte de Casación de Italia, según resumido por Mariano Alonso Pérez: "la responsabilidad precontractual no supone el resarcimiento de todos los daños contractuales sufridos por la otra parte, sino sólo de los perjuicios englobados en el llamado 'interés negativo' —*id quod interest contractum initum non fuisse*—; es decir, los gastos que la contraparte hizo en previsión del futuro contrato —viajes, informes periciales, asesoramientos, etc.—, así como las pérdidas ocasionadas por desaprovechar ocasiones favorables de celebrar un contrato con otras personas (C. de 10 de octubre de 1962, número 2919)." *La Responsabilidad Precontractual*, 47 Rev. Crítica de Derecho Inmobiliario 859, 905 (julio–diciembre 1971).

Resaltando estos elementos, es que uno mi voto a la opinión del Tribunal.