**PRIME RETAIL, L.P., Plaintiff,**

v.

**CARIBBEAN AIRPORT FACILITIES, INC., Defendant.**

**Civil No. 95–2425(JAF).**

United States District Court, D. Puerto Rico.

July 31, 1997.

Jaime E. Toro–Monserrate, Cristina Fernandez–Neumann, McConnell Valdes, San Jaun, PR, Charles Scheeler, Piper & Marbury L.L.P., Baltimore, MD, for Plaintiff.

Edgar Cartagena–Santiago, Ramon E. Dapena, Goldman Antonetti & Cordova, San Juan, PR, for Defendant.

### MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

FUSTE, District Judge.

This case, in which plaintiff Prime Retail, L.P. (Prime) sues Caribbean Airport Facilities, Inc.(CAF), was tried before this court from June 2 to June 18, 1997. The court enters its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I.

Several parties expressed interest during the summer of 1995 in purchasing CAF's real property in Canóvanas, Puerto Rico, including Belz Enterprises (Belz) and Prime. CAF and Prime entered into a letter agreement on August 7, 1995 (Letter Agreement), under which CAF would sell the Canóvanas property to Prime for development of a retail outlet shopping center. Such centers permit manufacturers to sell their overstocked goods to the public at a discounted price, and grew exponentially in the continental United States in the late 1980's and early 1990's. Over the past few years, saturation of markets has substantially levelled growth industry-wide. Densely populated Puerto Rico, with no significant retail outlet centers, provided developers with a much-needed untapped market.

This letter agreement was the product of negotiations between Anthony Tirri, President of CAF, and Abraham Rosenthal, Prime's Chief Executive Officer. The agreement required the parties "to negotiate a definitive real estate purchase option agreement" and bound CAF to exclusive discussions with Prime for thirty days from execution. In addition to the price, property, feasibility period, closing, and delivery, the letter agreement addressed the issues of the construction of a hotel, commissions, confidentiality, exclusivity, costs, and enforcement.

Eight days prior to the expiration of the thirty-day period, Prime forwarded its first draft of the option agreement to CAF, including a no-competition clause and an assignment clause unaddressed by the letter agreement. Mr. Tirri responded by returning the draft with markings indicating his counterproposal: The elimination of the noncompetition clause and the assignment clause, and a sharing of the development costs. The originally agreed-upon period expired on September 6, 1995, and CAF extended it for another thirty days without consideration. On September 20, 1995, Prime forwarded the earlier proposal, redlined with changes, none of which met Mr. Tirri's concerns. The new proposal broadened the noncompetition clause, specified that any assignee would have some corporate relationship with Prime, and counter proposed another cost-sharing configuration. In conversation, Ms. Jill Reynolds Seidman, Prime's in-house counsel on this project, indicated that assignments are usually made at closing, not earlier.

On October 6, 1995, Prime forwarded another draft agreement, requiring CAF to maintain development rights issued by the government, a fundamental change given the expense and difficulty of obtaining such rights. They also inserted changes regarding the negotiation of the allocation of land to accommodate the construction of Route 66, which would cross part of the Canóvanas property. Messrs. Rosenthal and Tirri conversed on October 6, 1995, and Mr. Tirri reasserted his willingness to follow the terms of the Letter Agreement. They agreed to extend the deadline for an agreement by three days, which Prime interpreted to exclude the weekend, giving them until October 11. Mr. Tirri, who understood the extension to include weekend days, did not countersign the faxed letter from Ms. Seidman that mentioned October 11 as the new deadline.

Prime sent three representatives to Puerto Rico to complete discussions. The afternoon of Monday October 9, the Prime group visited the property and then approached Mr.

Tirri in the late afternoon of October 9, the last day of his extension and the last in which an agreement could be reached within the terms of the Letter Agreement. Despite the lack of an accord that day, Mr. Tirri continued discussions the following day, although he noted that the deadline had expired. The discussions of October 11 proved fruitful and, although they did not lead to an agreement, there were several potential resolutions to the differences between the parties. On the same date, Mr. Tirri received a letter from Prime's Puerto Rico counsel indicating that the Letter Agreement did not come to fruition because of CAF and that Prime intended to hold CAF responsible if it did not lead to an accord. Contemporaneously, Prime evidently examined the possibility of executing a contract based solely on the terms in the Letter Agreement, but pursued a more aggressive stance with Mr. Tirri in their proposed contract.

Mr. Tirri sent Mr. Glenn Reschke, an Executive Vice President at Prime, a letter responding to the latest proposals, and indicating that the Letter Agreement period had expired. Mr. Reschke replied to this letter with a proposal containing still more new issues, those of utility easements and land dedication for the construction of Route 66, and ignoring the issue of the expiration of the Letter Agreement. Mr. Tirri objected to these changes and again pointed out that the Letter Agreement had expired. Mr. Reschke responded by requesting specifics from Mr. Tirri for the resolution of their remaining differences. Mr. Tirri, struck ill, was in the hospital when the next CAF–Prime contact occurred, with Mr. Koch, a representative of Prime, calling Mr. Tirri. During that call, Mr. Tirri expressed his interest in going forward with Prime using the terms of the Letter Agreement. CAF formally responded to Mr. Reschke's letter on October 23, 1995, unilaterally committing to hold discussions with Prime only until October 27, 1997. On October 25, 1995, Mr. Reschke responded with a proposed term sheet, largely acceptable to CAF, with the exception that Mr. Tirri amended the terms to reflect that CAF would only be required to dedicate land to the Route 66 project if the purchase option were exercised.

Without emitting any interim response, Prime sent Mr. Tirri an option agreement late on October 27, in which the entity cosigning the option agreement was no longer Prime, but Puerto Rico Factory Shops Limited Partnership. Although Prime has demonstrated that the ownership of the land by a local partnership is their business practice, this substitution completely surprised Mr. Tirri, who feared that an unknown or shell corporation would not provide him with substantial legal recourse. His surprise also emanated from Prime's own assurances that assignments, if any, would be made at closing and not earlier. Furthermore, there were drafting errors in this agreement.

Mr. Tirri rejected the draft agreement and notified Prime that CAF would begin negotiations with other parties. Prime refused to revert the terms of the agreement to specifically include Prime as a party to the contract. Negotiations between Prime and CAF ended.

Before, during and after the Prime–CAF negotiations, Belz had contact with CAF. During August and September, Belz' attorney, Mr. Juan Carlos Galanes, contacted Mr. Tirri on numerous occasions, discussing Route 66 and the effect of the new road proposed layout on the property. Belz repeatedly advanced offers to CAF during the period of exclusivity between CAF and Prime. Mr. Tirri forwarded the offers to the bank to evidence the certainty of the impending sale of the property. CAF and Belz began full and serious negotiations in late October and early November, culminating in their agreement on November 11, 1995. Prime alleges that this contact between Belz and CAF during the exclusivity period constituted negotiations and, as such, forms the principal basis for this suit.

## II.

■ In order to determine whether there was a breach, we must first establish the precise obligation into which the parties entered when they signed the letter agreement. The letter agreement is, at best, a preliminary contract. The Spanish term "precontrato" has been defined as not being "a con-

tract that promises another contract, but a base contract, in which the parties promise their activity directed toward the development necessary for its definitive conclusion." José Castán Tobeñas, *Derecho Civil Español, Común v. Foral,* Vol. 4, at 29 (15th ed.1993).[1] The contract in this case is not a precontract in its full form, where it serves as an initial part of a complex contractual relationship. Rather, it is a preliminary step to govern the interparty relations leading to the contract. Under Spanish law, the preliminary contract has as its goal greater security that there will be a future contract. José Puig Brutau, *Fundamentos de Derecho Civil,* Vol. II, at 2 (1982). The instant contract does not rise to the level of the precontract—it represents more what Professor Alberto Blanco calls "a promise to contract," Alberto Blanco, *Del Contrato de Promesa o Promesa de Contrato (Reflexiones Sobre El Tema),* 40 Rev. Jur. U.P.R. 31, 48 (1971), which may be set down by the parties in a letter or similarly informal document setting out the important terms without the details. *Id.*

Common law jurisdictions also recognize the effects of preliminary contracts or precontracts. The Second Circuit has enunciated two distinct preliminary contracts that parallel the civil law precontract and promise to contract or preliminary contract: "[B]inding preliminary contracts fall into at least two categories. Type I is where all essential terms have been agreed upon in the preliminary contract, no disputed issues are perceived to remain, and a further contract is envisioned primarily to satisfy formalities. Type II is where the parties recognize the existence of open terms, even major ones, but, having agreed on certain important terms, agree to bind themselves to negotiate in good faith to work out the terms remaining open. In Type II agreements, the parties do not bind themselves to conclude the deal but only to negotiate in good faith toward conclusion within the agreed framework." *Shann v. Dunk,* 84 F.3d 73, 77 (2d Cir.1996). Explicitly stated, the precontract is a Type I contract, whereas the preliminary contract or a promise to contract may be

more appropriately described as Type II. The PrimeCAF letter agreement has far more elements of a preliminary contract or a promise to contract than a precontract; it unequivocally falls into the category of Type II. It committed both parties to exclusive negotiations in good faith toward the achievement of a purchase option agreement. The letter agreement was the means to a contract rather than its end. The letter agreement did not bind the parties beyond good faith negotiation within the prescribed period and terms.

Other cases enlighten the reciprocal obligations of the parties in such preliminary contracts. For example, it has been established that a memorandum with open terms that makes reference to a future binding agreement is not an enforceable contract. *Arcadian Phosphates, Inc. v. Arcadian Corp.,* 884 F.2d 69, 72 (2d. Cir.1989). Another concern for this court to consider is the purpose of avoiding trapping parties in contractual obligations that they did not intend in a preliminary contract. *Teachers Ins. & Annuity Ass'n of America v. Tribune Co.,* 670 F.Supp. 491, 497 (S.D.N.Y.1987).

Given the nature of the contract in this case, Prime cannot assert breach simply on the nondevelopment of the property by Prime, since the letter agreement did not provide for the purchase of such property. In fact the letter agreement was separated by several degrees from the object of the negotiations. The letter agreement committed the parties to negotiate the creation of a contract to provide Prime first with the *option* of purchasing the Canóvanas property, which, in turn, required a final purchase sale agreement with definite financing before title would pass to Prime. For Prime to assert breach of the preliminary contractual phase, it would have to prove that CAF did not follow the terms of negotiation in the letter agreement.

■ Within the context of this type of preliminary contract, the leading case in Puerto Rico law of the precontractual duty of

---

1. The Spanish text reads: "En el precontrato no se trata [ ] de un contrato que *prometa* otro contrato, sino de un contrato *base,* en el cual las partes prometen su actividad, dirigida al desenvolvimiento necesario para su conclusión definitiva."

good faith negotiation provides clear guidance. *Producciones Tommy Muñiz. Inc. v. COPAN*, 113 D.P.R. 517 (1982). Puerto Rico law provides for a tort claim of *culpa in contrahendo*, which binds parties to act in good faith during preliminary negotiations. 31 L.P.R.A. § 5141; *Torres v. Garcia*, 119 D.P.R. 698, 703 (1987); *Producciones Tommy Muñiz*, 113 D.P.R. at 529.

In *Producciones Tommy Muñiz*, plaintiff was a television producer who sought to broadcast the Panamerican Games in Puerto Rico by bidding highest to defendant, the Organizational Committee of the Eighth Panamerican Games (COPAN). 113 D.P.R. at 518. COPAN produced a disputed draft contract and further negotiations were held to resolve the disagreements, resulting in seven subsequent drafts. *Id.* at 519. COPAN ultimately ceased negotiations with Tommy Muñiz, granting the Government of Puerto Rico the television rights. *Id.* at 521. Although there was no contract, the Puerto Rico Supreme Court held that defendants acted outside of good faith parameters during negotiations and were liable under *culpa in contrahendo* principles. Id. at 531. Thus, although the instant contract was a preliminary promise to contract, duties still attach to both parties to engage in the pursuit of the contract in good faith.

Prime asserts that CAF further breached the agreement by changing the terms and not negotiating exclusively with Prime. In analyzing the negotiation patterns in this case, we find that CAF cannot be held liable to Prime for *culpa in contrahendo*, since it did not negotiate in bad faith. The letter agreement did indeed prohibit CAF from entering into discussions or negotiations with another party. Yet, the plaintiff's thorough and exacting examinations of Messrs. Galanes and Tirri failed to expose any exchange between CAF and Belz that constituted discussions or negotiations during the forbidden period. Their talks centered on the process by which Puerto Rico government agencies would design and construct Highway 66, while Belz unilateraly proposed to open negotiations with Mr. Tirri. Although Mr. Tirri had not labelled his negotiations with Prime as exclusive, he accurately characterized them sufficiently to induce Mr. Galanes to urge Belz to step out. *Trial Transcript at 988*. Mr. Tirri's attitude gave Mr. Galanes the clear impression that Belz could not negotiate with CAF, despite Belz' and Mr. Galanes' interest in so doing. Although it may be true, as Prime asserts, that these calls built a degree of comfort level for Mr. Tirri in the possibility of developing a business relationship between Belz and CAF, we cannot equate these conversations with either negotiations or discussions in violation of the letter agreement.

A close study of the negotiation tactics of the parties further demonstrates the lack of convincing evidence of a breach. Prime claims that CAF breached the pact by changing the terms. However, Mr. Tirri's behavior toward Prime evinced a clear interest in forming an agreement with them. The letter agreement itself granted Prime exclusive negotiations without any consideration on Prime's part. CAF repeatedly extended this period of exclusivity without consideration, a notable sign of its intentions given the time value of money, particularly for CAF, at that time.

Contrary to Prime's assertions, CAF's dealings were largely directed toward accomplishing the goal of the letter agreement. Prime paints Mr. Tirri as fickle, yet the incessant waves of changes made to each successive draft by Prime reveal their own mercurial behavior. Late in the negotiations, in the face of these changes, Mr. Tirri made it quite plain to Mr. Koch that he wanted a contract that followed the four corners of the letter agreement. Indeed, Prime's changes rendered the mutual consent of a second contract necessary, since the plethora of new terms vitiated the mutual consent of the letter agreement. The two near-misses in October demonstrate that as far as Prime strayed from the original agreement, Mr. Tirri at several points attempted to accomodate them. Twice that month, he expressed his belief that a deal was imminent, despite the fact that the original letter agreement had undoubtedly expired by that time. In sum, Prime's own negotiation techniques render it at least as responsible for the failure to reach an agreement as CAF.

*See, e.g., Pérez v. Sampedro,* 86 D.P.R. 526, 503 (1962) (holding that claimant cannot maintain action for breach where claimant's actions are the proximate cause of the damage).

Prime emphasizes that CAF ultimately contracted with a corporate structure analagous to the one rejected by CAF when proposed by Prime. A crucial distinction may be made in the fact that Prime introduced this new term at the last minute without preparing Mr. Tirri for the issue, and after specifically stating that such a change would only arise at a later stage. By the time his negotiations with Belz were bearing fruit in early November, Mr. Tirri naturally had a greater understanding of this corporate structure after having weeks to consider its ramifications. We find this element of the negotiations does not outweigh the scattered negotiation tactics of Prime.

 Finally, we further add that the contract in this case had a limited term during which the parties fell under its obligations, and for the reasons we have expressed, the time lapsed. Puerto Rico law supports a highly strict interpretation of such contractual and other statutory short time limitations under the doctrine of caducity ("prescripcion extintiva"). Caducity "is based in that the exercise of certain rights only are possible within a certain time." Otherwise, the rights are extinguished. José Maria Martinez Val, *Derecho Mercantil* 447 (Editorial Bosch, Barcelona, 1979). Under prescription, there may be tolling of a deadline. Caducity permits no such leeway: When the expiration date has passed, all obligations are completely extinguished. *See id.; Mortensen & Lange v. San Juan Mercantile Corp.,* 119 D.P.R. 345, 351–53 (1987); *Autoridad de los Puertos de Puerto Rico v. P.M.J. Automotores S.E.,* 916 F.Supp. 115, 116 (D.P.R.1996); *R.P. Farnsworth v. Puerto Rico Urban Renewal & Housing Corp.,* 289 F.Supp. 666, 669 (D.P.R.1968).

 In this case, the letter agreement was a contract with a specific deadline of thirty days, extended twice by CAF through amendment and spoken agreement. Because the doctrine of caducity governs, CAF was under no obligation to extend the agreement. Having voluntarily extended the agreement, CAF was obligated to follow its requirements. However, once the extensions had expired, CAF had absolutely no duty whatever to Prime. It is a "natural and unavoidable consequence of all precontracts in which there is an express term for the completion of a promised contract, that once that precontract has expired, the term remains *caducus.*" *See e.g., José Castán Tobeñas, Derecho Civil Español, Común y Foral,* Vol. 4, at 37 n. 1.[2] Colloquially, once the promise to contract is over, it is over, as it was here after the expiration of the letter agreement and its extensions. At that point, CAF, without obligation to Prime, was entirely free to pursue negotiations with Belz.

### III.

In conclusion, because Prime has failed to prove that CAF breached the letter agreement or negotiated in bad faith, we, therefore, find in favor of defendant. Judgment shall be entered dismissing the complaint filed by Prime Retail, L.P.

**IT IS SO ORDERED.**

---

2. The Spanish text reads "[c]onsecuencia natural e ineludible de to dos los precontratos en los que expresamente se fija un plazo para la celebracion del contrato prometido, que transcurrido ese plazo queda caducado el contrato."