**K–MART CORPORATION, Plaintiff,**

v.

**Mark B. DAVIS, et al., Defendants.**

**Civ. No. 90–2525 HL.**

United States District Court,
D. Puerto Rico.

Jan. 30, 1991.

Edward M. Borges, Alfredo F. Ramirez–MacDonald, O'Neill & Borges, Hato Rey, Puerto Rico, Edward H. Pappas, Daniel M. Brinks, Dickinson, Wright, Moon, Van Dusen & Freeman, Bloomfield Hills, Mich., for plaintiff.

Leonardo Andrade Lugo, Jose A. Axtmayer, Eugenio C. Romero De Juan, Jorge Segurola Perez, Goldman, Antonetti, Ferraiuoli, & Axtmayer, San Juan, Puerto Rico, for defendants.

## OPINION AND ORDER

LAFFITTE, District Judge.

This is a diversity action involving, in the main, allegations of breach of contract and tortious interference with contractual relations. Plaintiff seeks injunctive relief and damages. At oral argument on plaintiff's motion for a preliminary injunction, the Court suggested consolidating the motion with a hearing on the merits limited to the issue of permanent injunctive relief. *See* Fed.R.Civ.P. 65(a)(2) [1]; *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Caribbean Produce Exchange v. Secretary of Health and Human Services,* 893 F.2d 3, 5 (1st Cir.1989); *New England Anti–Vivisection Society v. United States Surgical Corp.,* 889 F.2d 1198 (1st Cir.1989); 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2950 (1973). The parties agreed to consolidate and after extensive testimony supplementing the already voluminous written record, defendants moved,

---

**1.** In pertinent part, Rule 65(a)(2) provides: ·Before or after the commencement of a hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing of the application. Fed.R.Civ.P. 65(a)(2).

pursuant to Fed.R.Civ.P. 41(b), to dismiss plaintiff's claims for injunctive relief. The Court, on January 23, 1991, following a six day hearing, granted defendants' motion. To amplify upon this bench ruling, as announced, the Court now sets forth in more detail its reasons for denying plaintiff's request for an injunctive remedy.

## I. *The Present Action*

Plaintiff Kmart Corporation ("Kmart"), a national chain of general merchandise discount department stores, seeks to enjoin defendants, a group of shopping center developers, from engaging in any activities detrimental to Kmart's right to place its stores in developments located in Fajardo, Arecibo and Juana Díaz, Puerto Rico. Specifically, Kmart requests that this Court enjoin the defendants Mark B. Davis, Mark Greene and Luis Alberto Rubí and their partnerships—organized under the laws of Puerto Rico—Fajardo Partners and TJAC, and the Davis–Villamil Companies, a Florida corporation, from entering into any lease agreements concerning these developments with Wal–Mart, Kmart's largest national competitor.

In brief, it is Kmart's contention that defendants fraudulently, in bad faith and without justification broke commitments and agreements to enter into leases with Kmart for stores to be built in Fajardo and Arecibo. Kmart also claims that defendants improperly interfered with a lease agreement between Kmart and Edgardo Julien Rivera Gómez for a store to be built in Juana Díaz. Kmart alleges that defendants adopted this course of action in order to gain a monetary advantage by ultimately leasing the stores to Kmart's competitor, Wal–Mart. Absent the issuance of an injunction, Kmart states that it will be prevented from entering certain markets and that its goodwill and reputation will be permanently harmed resulting in extensive damages "impossible to quantify [and] which defendants will be unable to satisfy." Plaintiff's Brief in Support of Motion For Preliminary Injunction, at 2.

## II. *Background*

The issue of whether injunctive relief is warranted demands a brief understanding of the history of the negotiations between the parties. The facts discussed herein are limited to those which have an ultimate bearing on the appropriateness of awarding an equitable remedy. In January, 1988, Davis, Greene and Rubí formed several partnerships (collectively "TJAC" or "the TJAC partners") which contemplated the development of shopping centers in Puerto Rico. TJAC's entree into the local shopping center business began when it acquired a parcel of property in Vega Baja where plans to erect a shopping center were already underway. Kmart had been negotiating with the previous developers of the Vega Baja property to place one of its stores in the soon to be completed center.

On July 1, 1987, Kmart told the previous developers that Kmart's Executive Action Committee (the "EAC") had approved the Vega Baja site. This EAC approval was conveyed to the developers in a standard Kmart form letter (hereinafter "the EAC approval letter") which also included the following language:

> The Executive Action Committee's action is contingent upon ratification by our Board of Directors at its regularly scheduled meeting on July 21, 1987, subject to concluding a mutually satisfactory Lease Agreement within ninety (90) days after ratification by the Board.... Any expenditure incurred on your behalf pursuant to or on the basis of this letter, is undertaken at your sole risk. This company can recognize no obligation except as may arise out of the fully executed lease contemplated hereby.

Plaintiff's Exhibit 4.

Upon learning of defendants' acquisition of the Vega Baja site, Kmart sent a letter, on September 27, 1988, to Davis, summarizing the July EAC approval letter and indicating that "[a]lthough Kmart Corporation has approved the Vega Baja, Puerto Rico location, the construction plans have not been approved nor has a lease been finalized ..." Joint Exhibit 7. Kmart stated further that it wished to discuss the "lease proposal ... however this Corporation can recognize no obligation except as may arise out of the fully executed lease." *Id.*

From September, 1988 until March, 1989, Kmart and TJAC hammered out the kinks—ranging from increases in the proposed base rent to potential sink hole problems—that stood in the way of a mutually satisfactory lease. On March 14, 1989 the parties signed the Vega Baja lease.

During the Vega Baja negotiations, the parties grew interested in three other planned developments in San German, Fajardo and Arecibo. Following the consummation of the Vega Baja deal, in July of 1989, Kmart sent three letters of interest confirming its desire to pursue negotiations regarding the proposed sites. Each letter stressed that Kmart's interest was "of course, subject to ... the execution of a mutually acceptable lease." Joint Exhibits 31, 33, 34. From July through November of 1989 the parties engaged in discussions regarding site plans, locations, dimensions, and other construction aspects of the three projects. Attention then focused largely on the San German project and on March 30, 1990, the San German lease was executed.

On December 11, 1989, Kmart sent Davis its standard EAC approval letter for the Fajardo project. This letter, identical to the July 1988 Vega Baja EAC approval letter, conditioned acceptance of the Fajardo site on Board ratification followed by the execution of a mutually satisfactory lease ninety days thereafter. It also included Kmart's standard "no obligation" clause, whereby Kmart explained that it could "recognize no obligation except as may arise out of the fully executed lease." Joint Exhibit 51. Similar EAC approval had been conveyed orally to defendants regarding the Arecibo project.

Negotiations on the Fajardo and Arecibo projects continued into the spring of 1990. By July of 1990, however, it was still unclear whether the Arecibo center would be developed as a mall or as a large power strip. The Fajardo project had reached a more serious impasse with respect to vehicle access. On April 13, 1990, Kmart sent Davis a letter stating that "[i]n its present configuration this access plan is totally unacceptable, and Kmart cannot move forward until a reasonable solution is found." Joint Exhibit 68. Ultimately, the parties were able to break the deadlock on the access problem and negotiations continued.

On August 6, Davis, on behalf of TJAC, asked Kmart if it would consider becoming TJAC's equity partner for the Fajardo, Arecibo and San German projects. Davis had explained to Kmart that TJAC had lost its equity partner and that unless financing could be made available the developments could not continue. On August 7, 1990, Kmart sent Davis a draft of the lease agreement for the Fajardo store as well as a letter expressing "disappointment ... because of [the] shake up" with TJAC's equity partner. Plaintiff's Exhibit 81. Kmart asked to remain advised of any developments in this regard. *Id.*

During the previous month, TJAC and Wal–Mart began to pursue plans of their own to place Wal–Mart stores on the island in sites other than Fajardo and Arecibo. Much of the discussion centered on the possibility of Wal–Mart becoming TJAC's tenant and equity partner. On August 10, 1990, after Davis had communicated the equity problem to Kmart, defendants signed an exclusive agreement with Wal–Mart to develop shopping centers on the island with Wal–Mart stores as the anchor tenant. In exchange, Wal–Mart agreed to provide the necessary equity. This agreement now included the sites in Fajardo and Arecibo.

It appears that Kmart heard rumblings through the grapevine that defendants had been negotiating with Wal–Mart and that the negotiations included the Fajardo and Arecibo sites. After several attempts to contact Davis and other TJAC partners failed, Kmart sent Davis a letter on September 27, 1990. In it, Kmart expressed its intent to finalize the Fajardo lease, as well as its concern over the fate of the projects. Kmart stated that "[w]e have ... not pursued other opportunities in reliance upon the mutual commitments and expect you to do the same." Joint Exhibit 97. Davis responded on October 3, 1990, with "surprise that [defendants] were

somehow bound by mutual commitments" and concluded by advising Kmart that TJAC had "elected to lease the main anchor spaces in [Fajardo and Arecibo] to others." Joint Exhibit 101.

## III. *Discussion*

■ The standard for reviewing a request for a preliminary injunction is well established.

As is well known, a district court may grant a preliminary injunction if it finds that (1) without it the plaintiff will suffer irreparable injury, (2) the injury outweighs the harm the injunction will cause the defendant, (3) the plaintiff has shown a likelihood of success on the merits, and (4) the injunction is consistent with "the public interest."

*United Steelworkers of America v. Textron, Inc.*, 836 F.2d 6, 7 (1st Cir.1987) (quoting *Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981)). Where, as here, the action has been consolidated—allowing the parties a full opportunity to present the merits of their cases—and permanent injunctive relief is involved, the standard of review is essentially the same except that the movant must show actual success on the merits rather than a mere likelihood. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *University of Texas v. Camenisch, supra*, 451 U.S. at 394, 101 S.Ct. at 1834; *K–Mart Corp., v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir.1989). While the four requirements are generally considered together, the Court will focus its attention on the requirement of success on the merits. This is the threshold inquiry and thus is critical to the appropriateness of an award of injunctive relief.

■ At the outset, the Court notes that Kmart's claim of tortious interference with contractual relations is inappropriate to the consideration of injunctive relief. Kmart contends that TJAC interfered with Kmart's business relationship with Edgardo Rivera which contemplated the lease of a Kmart store in Juana Díaz. This issue is moot insofar as it relates to the remedy of specific performance, however, because Kmart has executed its lease with Rivera for the Juana Díaz project. There being nothing to enjoin, and the proper remedy—if any—lying in damages, the Court need not consider this claim further.

The critical question before the Court is whether binding contracts exist for the Fajardo and Arecibo sites between Kmart and TJAC. For a contract to be binding there must be an offer, an acceptance and a meeting of the minds as to the terms agreed upon. Article 1213 of the Puerto Rico Civil Code predicates a valid contract on "(1) [t]he consent of the contracting parties; (2) [a] definite object which may be the subject of the contract; (3) [t]he cause for the obligation which may be established." 31 L.P.R.A. § 3391. The Civil Code states further that "[c]ontracts shall be binding ... provided the essential conditions required for their validity exist." 31 L.P.R.A. § 3451. The present case lacks the oft-encountered troublesome technicalities surrounding such areas as mistake, revocation, repudiation and frustration that have made the seemingly simple process of offer and acceptance a vexing one for both courts and commentators for so long. The issue here is simply whether the parties are bound to enter into the Fajardo and Arecibo lease agreements.

■ The thrust of Kmart's argument is its contention that the overall course of dealing between the parties and the issuance of its standard EAC approval letter evidences a binding agreement with TJAC. This contention cannot withstand analysis. After careful consideration of the oral testimony and written record, the Court is struck by the one glaring fact that the parties to this action continued to wrestle with the essential terms of the lease agreements well after the issuance of the EAC approval letter. With respect to the Vega Baja site—which plaintiffs refer to as the pattern lease—Kmart's EAC approved the site in July of 1988. After TJAC's arrival in September it took the parties seven more months of hard-headed negotiating to finally agree to all the terms that would make up the lease agreement. Then, and only

then, was a lease actually executed. Similarly it took the parties over nine months to execute a lease agreement for the San Germán project. These lease negotiations are instructive because they indicate a pattern of dealing whereby the parties would negotiate essential terms of the lease prior to finalizing any agreement in writing. The Court now turns its attention to the Fajardo and Arecibo projects.

The evidence presented concerning the Fajardo and Arecibo sites indicates the considerable distance that the parties had to cover before actually executing a lease. With respect to Fajardo, while the EAC approved the site in November of 1989, it was not until August 7, 1990, that Kmart forwarded its draft of the proposed lease. This delay was largely due to the inability of the parties to agree on vehicle access—a term that if unresolved could have left the project dead in the water. Once a draft of the Fajardo lease was sent to defendants, it turned out to be an updated version of Kmart's semi-gross lease that provided the shell for the Vega Baja and San Germán negotiations. *See* Testimony of Donald L. Dayne, Vol. 5 at 87.[2] This updated version of Kmart's draft lease included several substantive modifications to the leases previously agreed to.

For example, in the Fajardo draft, Kmart varies the formula previously used both in calculating its contribution to common area maintenance and the amount it was to contribute to property taxes. The Fajardo draft also includes a restriction on any future construction by the developers of any building in excess of 50,000 square feet as well as an added provision prohibiting the building of any structure closer than 350 feet from the roadway. The Fajardo lease also includes a higher parking ratio giving Kmart more parking spaces per 1000 square feet of store space than were allotted in the previous two leases. *See generally* Plaintiff's Exhibit 81. All of these lease terms were deemed essential according to Kmart's own testimony. *See* Dayne, Vol. 5 at 56–86. Kmart argues,

however, that this updated version did not reflect its unwillingness to discuss the altered provisions. In fact, Kmart suggests that it might have been amenable to a TJAC suggestion to discard the updated version altogether and to pursue the Fajardo development based on the Vega Baja or San Germán lease. *See* Dayne, Vol. 5 at 55. This argument misses the point. Whether TJAC would have accepted the updated draft does not change the fact that an updated draft existed. Consequently, it cannot be gainsaid that the parties would have been required to pursue and exhaust negotiations concerning the substantive modifications included in the Fajardo draft lease. Accordingly, and as a matter of basic contract law, there can be no binding agreement where the parties have failed to agree to the essential terms that will ultimately govern the contract. 31 L.P.R.A. § 3451.

The case of Arecibo is much simpler as negotiations for that project were far less advanced. There the parties had not even reached a decision as to the location and configuration of a Kmart store. The developers were still vacillating between the construction of a strip mall and the construction of a shopping center when negotiations came to a halt. Consequently, Kmart had yet to send defendants an EAC letter of approval or a proposed lease. Concerns as basic as the rent, property tax, and common area maintenance charges had not been discussed. Kmart's optimism regarding a future meeting of the minds notwithstanding, the Fajardo and Arecibo negotiations clearly lack the maturity upon which a grant of specific performance can be based.

The case of *Producciones Tommy Muñiz, Inc. v. Copan*, 113 D.P.R. 517 (1982), decided by the Puerto Rico Supreme Court, is instructive. There, Muñiz, a television producer, submitted the lowest bid on the rights to televise the Panamerican games to be held in San Juan. The terms

---

**2.** References to testimony during the permanent injunction proceedings will hereinafter be indicated by the witness' name, followed by the volume in which the testimony occurs and the page number.

under which he was to broadcast the games included the installation of a television center. Muñiz assumed that the center would be for local use only, while *Copan* envisioned international transmission. After extensive negotiation on this point, *Copan* received the go-ahead to transmit the games via a government station and it suspended negotiations with Muñiz. The Supreme Court affirmed a lower court decision finding the absence of a contract upon which injunctive relief could lie.

The crux of the court's holding in *Copan* turned on the fact that the television center was an essential element of the offer and it "had to be clearly defined in concrete terms ... so that its acceptance by *Copan* could generate a contractual bond." *Copan,* 113 P.R.R. at 672. The court noted, however, that although negotiations had been extensive, this particular term remained undefined. The court stated that "[t]he very acts of the parties who discussed and drew seven different drafts in an effort to reconcile their particular interests prove that the parties' idea of the television center ... was not clear." *Copan,* 113 P.R.R. at 673. Similarly, K–Mart and TJAC sent numerous letters to one another requesting modifications, alterations and changes to the proposed terms. Until these terms were finally agreed to, there could be no binding acceptance necessary to perfect a contract.

Despite the fact that the parties had failed to agree on many of the essential terms with regard to the Fajardo and Arecibo developments, Kmart insists that the parties are bound by the issuance of the EAC approval letter. This argument is equally without merit. By Kmart's own admission, the EAC approval letter merely speaks in general terms. *See* Dayne, Vol. 5 at 56. Moreover, even though the EAC approval letter includes a space for the recipient's signature, Kmart stated that it did not need to be signed. *Id.* at 24. Kmart explained: "[TJAC] already knew the terms and conditions from our previous

agreement, and we were summarizing them ... in this letter." *Id.* at 23. When asked on what terms Kmart believed the parties to be bound, Kmart responded: "The business terms outlined in the commitment letter based on the ... Vega Baja lease form." *Id.* at 24. As has been shown, however, the Fajardo draft lease differed markedly from the Vega Baja lease. Thus, any suggestion that the Vega Baja lease was meant to act as a pattern lease upon which to infer the binding nature of a subsequent EAC approval letter is unpersuasive. This is especially so in light of the fact that the EAC approval letter was never signed nor accepted orally by TJAC. The letter is hardly a document evidencing a commitment to be bound by a contractual lease for the next sixty years.

■ The nascent state of negotiations notwithstanding, Kmart argues that the course of dealing between the parties created an intent to be bound. Indeed, the intent of the parties is of paramount concern in determining a contract. *See Marina Industrial, Inc. v. Brown Boveri Corp.,* 114 D.P.R. 64, 68–71 (1983). But the inclusion in Kmart's EAC letter of the "no obligation" clause indicates that Kmart itself was unwilling to be bound. Ultimately, this language is fatal to Kmart's efforts to seek injunctive relief.[3] Kmart's recognition that it had "no obligation except as would arise out of a fully executed lease" serves to confirm the involute nature of shopping center lease negotiations. The plain meaning of such language is to warn the developer not to rely on any manifestations of interest or intent on the part of Kmart as the basis for a binding commitment. It would be contrary to our civil law of contracts to allow one party to an agreement to unilaterally withdraw, while holding the other bound at all times. *See* 31 L.P.R.A. § 3373.

The Court subscribes to the view articulated by the Fifth Circuit in *Dumas v.*

---

**3.** Kmart submits the theory of promissory estoppel as an alternative basis for injunctive relief. This theory fails here since any detrimental reliance that Kmart alleges to have incurred is defeated by its own manifestations of its intent not to be bound. Moreover, liability based on promissory estoppel cannot lie where, as here, the promise was indefinite and merely an expression of future intention. *See Santoni v. FDIC,* 677 F.2d 174, 179 (1st Cir.1982).

*First Federal Savings and Loan Association*, 654 F.2d 359 (5th Cir.1981). That case involved a potential purchaser who sought to enjoin the sale of a shopping center by a bank to a third party. In negotiations with the potential purchaser, the bank received and initialed a letter which was to "act as the basic agreement, subject to a mutually acceptable Purchase and Sale Agreement." *Id.* at 360. The bank then accepted an earnest money deposit and took the property of the market in the hopes of arranging a sale. After the receipt of a draft of the purchase agreement was found to be unacceptable, however, the bank informed the potential purchaser of its intention to sell the property to a third party.

The Fifth Circuit stated that the language " 'mutually acceptable' connotes that the terms of the agreement are still subject to negotiation and not final.... Thus the letter agreement can only be characterized as 'an agreement to seek to agree in the future' and not as a final contract." *Id.* at 360–361 (citations omitted). The court also compared the detailed proposed lease with the letter which preceded it and found that, when read in tandem, the letter outlining the lease terms was "merely a starting point for a lengthier more detailed final document." *Id.* at 361 n. 2.

 The facts here weigh more heavily against plaintiff than in *Dumas.* TJAC never formally accepted the EAC approval letter in the case of Fajardo, and in Arecibo one was never even sent. And while Kmart certainly expended time and effort in negotiating with TJAC, the developers never accepted a money deposit nor did they indicate that they would withdraw the properties from the active market. Alternatively, Kmart suggests that "the parties' agreements required them at the very least to negotiate in good faith" and that such a duty is actually a "contractual obligation" that can be specifically enforced. Plaintiffs' Brief in Support of Preliminary Injunction, at 20. The Court notes that preliminary negotiations can indeed create a duty to deal in good faith. *See Copan*, 113 P.R.R. at 676–77. But as the court in *Copan* so aptly discusses, the existence of

pre-contractual liability for a breach of this duty gives rise to damages and not to injunctive relief. *Id.* at 676–680; *see also, Milton Torres v. Nora Garcia*, 119 D.P.R. 698, 703–04, n. 2 (1987) ("although the [Puerto Rico] Civil Code does not regulate *culpa in contrahendo* ... it is not unsuitable that based on the norms of Articles 1258 and 1902 of the Civil Code, the party that provoked reliance be obliged to indemnify the other with costs") (unofficial translation). *Cf. Channel Home Centers v. Grossman*, 795 F.2d 291 (3rd Cir.1986) (finding a binding agreement to deal in good faith and awarding specific performance based on a letter that included (1) a detailed discussion of most of the significant lease terms, (2) defendant's unequivocal promise to withdraw the property from the market and to pursue the lease to completion, and (3) defendant's signature). Therefore, a determination of the alleged breach of a duty to act in good faith is beyond the scope of this opinion.

### IV. *Conclusion*

As Kmart has failed to establish success on the merits entitling it to an award of injunctive relief, a discussion of the remaining preliminary injunction requirements is superfluous. Accordingly, defendants' Fed.R.Civ.P. Rule 41(b) motion to dismiss plaintiff's claim for injunctive relief is HEREBY GRANTED.

IT IS SO ORDERED.