CC-1996-351                                                              1

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| RBR Construction, S.E.<br>        Peticionario<br><br>        v.<br><br>Autoridad de Carreteras y<br>Transportación de P.R. y su Junta de<br>Subasta<br>        Recurrida | Certiorari<br><br>99 TSPR 184 |

Número del Caso: CC-1996-0351

Fecha: 22/12/1999

Tribunal de Circuito de Apelaciones: Circuito Regional I

Juez Ponente: Hon. Angel González Román

Abogado de RBR Construction, S.E.: Lcdo. Gerardo A. Quirós López

Abogados de la Autoridad de Carreteras: Lcdo. Luis A. Rivera Cabrera
                                        Lcdo. Raúl Castellanos Malavé

Abogados de Jusor Corporation: Lcdo. José M. Biaggi Junquera

Abogado de Las Piedras Const. Corp.: Lcdo. Roberto Corretjer Piquer


Materia: Revisión de Decisión de Agencia Administrativa

        Este documento constituye un documento oficial del Tribunal
        Supremo que está sujeto a los cambios y correciones del
        proceso de compilación y publicación oficial de las
        decisiones del Tribunal. Su distribución electrónica se hace
        como un servicio público a la comunidad.

EL TRIBUNAL SUPREMO DE PUERTO RICO


RBR Construction, S.E.

    Peticionario

       v.
                      CC-1996-351

Autoridad de Carreteras y
Transportación de P.R. y su
Junta de Subasta

    Recurrida


Opinión del Tribunal emitida por la Juez Asociada señora NAVEIRA DE RODÓN.



San Juan, Puerto Rico, a 22 de diciembre de 1999

El 30 de noviembre de 1994, RBR Construction (en adelante RBR) compareció junto a otros cuatro licitadores a una subasta convocada por la Junta de la Autoridad de Carreteras y Transportación de Puerto Rico (en adelante la Junta) para la realización de un proyecto en el Expreso Román Baldorioty de Castro. En dicha subasta, la Junta leyó en voz alta el precio total de las proposiciones de cada uno de los cinco postores. Sin embargo, <u>no se procedió a leer los precios unitarios de cada partida de las tres licitaciones más bajas, como era la costumbre.</u> Tras eliminarse la licitación menor por deficiencias insubsanables,

RBR resultó ser el <u>postor responsable</u> más bajo en esta primera subasta.[1]

El 1 de diciembre de 1994, la Junta notificó a RBR que su licitación había sido rechazada debido a que su seguro de fianza ("bid bond")[2] "no fue cumplimentado en su totalidad de acuerdo a los Arts. 102.07 y 102.11 de los General Provisions." En concreto, el incumplimiento se reducía a que el seguro de fianza no contenía la fecha de subasta. El seguro de fianza, sin embargo, <u>había sido validamente emitido por la cantidad requerida e identificaba claramente la obra para la cual había sido prestado</u>. RBR protestó mediante carta el rechazo de su licitación.

Posteriormente, el 17 de enero de 1995, la Junta notificó a todos los licitadores que la subasta había sido anulada. Dicha comunicación <u>no expresaba las razones que motivaron la decisión de anular</u>. La notificación de la Junta lee como sigue:

> La Junta de Subastas de la Autoridad de Carreteras desea informarles que la subasta de referencia fue ANULADA, el 17 de enero de 1995.
> Desde el día indicado comenzó a correr el término de diez (10) días, para solicitar reconsideración de consideración [sic] afectado adversamente por la decisión de la Agencia, según dispone la Sección 3.19 de la Ley de Procedimientos [sic] Administrativos [sic] Uniforme de Puerto Rico, Ley Núm. 170 del 12 de agosto de 1988, según enmendado [sic]
>
> Gracias por su participación en nuestras subastas.

A pesar de la solicitud de RBR al efecto, la Junta se negó a proveerle los fundamentos para la decisión de anular. Sin embargo, la Administración Federal de Autopistas (FHA por sus siglas en inglés), agencia de la cual la Junta tenía que solicitar el aval para poder anular la subasta, proveyó a RBR copia de una carta de la cual se

---

[1] La propia Autoridad de Carreteras y Transportación (en adelante ACT) admite en su comparecencia ante nos que, una vez la licitación más baja fue eliminada por deficiencias insubsanables, RBR se convirtió en el postor más bajo. Sin embargo, alega que "por tener omisiones contrarias a la sección 102.14 del *Blue Book* es altamente dudoso que se le hubiese adjudicado la subasta, de ésta no haber sido anulada".

[2] Cabe señalar, que esta fianza se limita a garantizar que el licitador que obtenga la buena pro comparecerá a la posterior firma del contrato de la obra subastada. De no comparecer, la ACT recibe el 5% del costo aproximado de la obra en concepto de daños.

desprende el motivo.  En ésta, la Junta cita el no haber <u>leído en voz</u> <u>alta los precios unitarios por partida de las tres licitaciones más</u> <u>bajas</u> como el fundamento para anular la subasta.

El 26 de enero de 1995, RBR solicitó reconsideración de la decisión de anular ante la Junta.  Ésta fue rechazada de plano y RBR solicitó revisión al Tribunal de Primera Instancia[3].  Impugnó tanto la decisión de anular como el fundamento por el cual la Junta rechazó su licitación.  Además, pidió que se le declarará postor razonable más bajo.

Inicialmente, el foro de instancia desestimó el recurso por falta de jurisdicción.  Fundamentó su decisión en que la reconsideración ante la Junta se había presentado tardíamente.  Oportunamente, RBR acudió ante el Tribunal de Circuito de Apelaciones (en adelante Tribunal de Circuito) quien revocó y devolvió al foro de instancia para la continuación de los procedimientos.  Tras reevaluar el recurso de revisión, el tribunal de instancia lo denegó en sus méritos.

La escueta sentencia no expresó el *ratio decidendi* del mencionado foro.  Sin embargo, en una nota al calce, el tribunal adujo <u>como</u> <u>fundamento adicional</u> para desestimar que el recurso se había tornado <u>académico</u> por que la Junta ya había celebrado una nueva subasta en la cual se había adjudicado el proyecto a otro licitador.[4] Cabe señalar que RBR intentó detener la celebración de la referida segunda subasta mediante dos mociones en auxilio de jurisdicción, las cuales no fueron atendidas.

---

[3] Simultáneamente se presentó idéntico recurso ante este Foro.  Ello, en atención a que la Ley de la Judicatura de 1994 ya había entrado en vigor y RBR no sabía con certeza cuál era el foro competente.  Al recurso se le asignó el número de AA-95-5 y posteriormente se remitió al tribunal de instancia.  Se consolidó con el recurso allí presentado mediante resolución el 11 de agosto de 1995.

[4] La nota al calce lee:

> <u>Además</u>, el recurso se tornó académico al celebrarse una nueva subasta y adjudicársele la misma y otorgarle el contrato a otro licitador desde hace más de un año atrás.(Énfasis suplido.)

Inconforme con dicho resultado, RBR acudió nuevamente al Tribunal de Circuito. En esencia, cuestionó la determinación de academicidad del tribunal de instancia. Además, reprodujo los planteamientos de que su propuesta fue indebidamente rechazada y de que la Junta anuló ilegalmente la subasta por no expresar a los licitadores los fundamentos. Argumentó que, de determinarse que la Junta actuó de forma ilegal al anular la primera subasta y al rechazar su licitación, la ACT debía compensarle la pérdida económica sufrida.

El Tribunal de Circuito denegó el recurso ante si por académico. Fundamentó su conclusión en que la segunda subasta se había celebrado y los trabajos del proyecto estaban avanzados. La terminación del proyecto estaba pautada para el 7 de noviembre de 1996. Además, el foro apelativo adujo que RBR no tenía razón en plantear que la subasta fue indebidamente anulada ya que el Reglamento de Subasta le confería a la Junta la facultad de cancelar la adjudicación del contrato en cualquier momento antes de éste ser formalizado.

Al no estar de acuerdo con el dictamen del foro apelativo, RBR acudió ante nos. En apretada síntesis, RBR sostiene que el Tribunal de Circuito erró al determinar que el recurso ante sí era académico y al convalidar la actuación de la Junta de anular la subasta. Además, cuestiona la legalidad de la notificación cursada a los licitadores y la razonabilidad del fundamento por el cual fue descalificada su licitación. Le asiste la razón. Por ello, revocamos.

En primer lugar, nos corresponde examinar el señalamiento referente a la academicidad y la procedencia de la reclamación en daños. En segundo lugar, discutiremos la legalidad de la anulación de la subasta y la adecuacidad de la notificación a los licitadores. Finalmente, veremos la razonabilidad del fundamento por el cual la Junta rechazó la licitación de RBR.

**II**

Un caso académico es uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos. Pueblo v. Ramos Santos, res. 30 de junio de 1995, 138 D.P.R. ___ (1995), 95 JTS 94, pág. 1054; Pueblo en interés del Menor M.A.G.O., res. el 22 de febrero de 1995, 138 D.P.R. ___ (1995), 95 JTS 25, pág. 681. "Esta doctrina requiere que durante todas las etapas de un procedimiento adversativo, incluyendo la etapa de apelación o revisión, exista una controversia genuina entre las partes." Pueblo v. Santos Ramos, supra, pág. 1054.

Los tribunales pueden perder su jurisdicción en un caso por academicidad cuando ocurren cambios durante el trámite judicial, ya sean fácticos o en el derecho aplicable, que hacen que una controversia pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no pueda tener efecto real alguno en cuanto a esa controversia. Fulana de Tal y Sutana de Cual v. Demandado A, res. 13 de junio de 1995, 138 D.P.R. ___ (1995), 95 JTS 76, pág. 954. (Énfasis suplido.)

Sin embargo, hemos reconocido varias excepciones a la doctrina de academicidad, a saber: (1) cuando se plantea una cuestión recurrente que, por su naturaleza, se hace muy difícil dilucidarla nuevamente en los tribunales; (2) cuando la situación de hechos ha sido cambiada por el demandado pero no tiene visos de permanencia; (3) cuando las controversias aparentemente son académicas, pero que en realidad no lo son por sus consecuencias colaterales; y (4) cuando el tribunal ha certificado un pleito de clase y la controversia se tornó académica para un miembro de la clase, mas no para el representante de la misma. Véanse, Pueblo v. Ramos Santos, supra, pág. 1054 y Partido Popular v. Pedro Roselló González, res. 22 de diciembre de 1995, 138 D.P.R. ___ (1995), 95 JTS 165, págs. 441-442.

El hecho de que la Junta haya celebrado una nueva subasta y adjudicado el proyecto a otro licitador, no convierte en académica la controversia de autos. Ni siquiera la torna académica el que se haya terminado la construcción del proyecto en cuestión. No solo se trata de una controversia susceptible de repetición, se trata de una controversia que tiene importantes consecuencias colaterales para el interés público en proteger los fondos del pueblo de Puerto Rico. No nos encontramos frente a una controversia ficticia en la cual no se puede proveer remedio real alguno. La adjudicación del proyecto no es el único remedio al cual RBR podría tener derecho.

Resolver en los méritos la presente controversia ciertamente afectará a las partes interesadas. De determinarse que la subasta fue ilegalmente anulada y que el fundamento para rechazar la licitación de RBR fue insuficiente, procedería que la Junta compensara a RBR por los daños que sufrió como consecuencia de estos actos. Como vemos, RBR no quedaría huérfano de remedio. A pesar de que no puede adjudicársele un proyecto que ya fue subastado y construido, RBR podría recibir compensación en daños si la agencia abusó de su discreción.

Ciertamente, el licitador perdidoso en una subasta ilegalmente anulada o adjudicada está impedido de recuperar ganancias dejadas de percibir en ausencia de fraude u otras circunstancias extraordinarias. Las ganancias dejadas de percibir son obtenibles, generalmente, sólo como remedio al incumplimiento de un contrato perfeccionado. No obstante, hemos reconocido que tanto el rompimiento injustificado de negociaciones precontractuales, como el abuso de derecho, son hechos ilícitos que pueden resultar en responsabilidad extracontractual. Véase, Tommy Muñiz v. COPAN, 113 D.P.R. 517 (1982). Entre los daños extracontractuales sufridos en casos como el de autos, podrían encontrarse, por ejemplo, los costos incurridos en prepararse para la licitación arbitrariamente anulada y otros gastos relacionados, incluyendo los intereses desde que éstos se incurren.

Avalar la postura de que la celebración de una segunda subasta torna las reclamaciones de autos en académicas sentaría un peligroso precedente, abriendo las puertas a la arbitrariedad, la corrupción y el despilfarro de fondos públicos. En la práctica, toda subasta de la Autoridad de Carreteras anulada ilegalmente quedaría inmune a la revisión judicial con la mera celebración de una segunda subasta. Esto podría equivaler a darle un cheque en blanco al funcionario de gobierno para que continúe celebrando subastas hasta que el postor de su predilección obtenga la buena pro.

En vista de que la controversia ante nos no es académica, nos corresponde considerar la legalidad de las actuaciones de la Junta al anular la subasta y rechazar la licitación de RBR.

## III

¿Puede una agencia administrativa anular una subasta fundándose en que no se leyeron en voz alta los precios unitarios por partida aunque ello no sea un requisito reglamentario? ¿Puede una agencia administrativa ejercer su discreción irrestrictamente sin incurrir en responsabilidad? Veamos.

La sana administración de un gobierno es,

> "una virtud de democracia, **y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección** para proteger los intereses y dineros del pueblo al cual dicho gobierno representa." Mar-Mol, Co. v. Adm. Servicios Gens, 126 D.P.R. 964, 871. (Énfasis suplido.)

El objetivo fundamental de las subastas es precisamente proteger el erario público consiguiendo la construcción de obras públicas y la adquisición de servicios de calidad para el gobierno al mejor precio posible. Para ello, es necesario fomentar la competencia libre y transparente entre el mayor número de licitadores posible.

En Mar-Mol, Co. v. Adm. Servicios Gens, supra, reiteramos la doctrina expuesta por este Tribunal desde Justiniano v. E.L.A., 100 D.P.R. 334 (1971), a los efectos de que:

> Los propósitos de la legislación que regula la realización de obras y la contratación de servicios para el Gobierno y los sistemas de subastas gubernamentales son precisamente ésos: **proteger los intereses y dineros del pueblo al promover la competencia para lograr los precios más bajos posibles**; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento. (Énfasis suplido.)

El elemento de la secretividad en la etapa anterior a la apertura de la licitación resulta indispensable para que el trámite de subasta sea uno de competencia efectiva y honesta. La anulación arbitraria de una subasta válidamente celebrada claramente derrota este objetivo. Una vez se han abierto las licitaciones, todos los postores conocen las cotizaciones de sus competidores. Esto permite que los más poderosos económicamente tengan la oportunidad de reducir sus propuestas en la segunda subasta, eliminando así a sus contendientes. La anulación indebida de una subasta puede crear competencia desleal en el proceso de licitación, lo que a su vez, podría tener como consecuencia el desalentar a un número de participantes en subastas gubernamentales posteriores.[5] La merma en los licitadores tiende a encarecer el costo de los bienes o servicios objeto de dichas subastas.

En Puerto Rico el legislador no ha creído necesario aprobar una ley especial que regule los procedimientos de subasta aplicable a todas las compras gubernamentales. Queda pues, a la discreción de cada agencia aprobar un reglamento estableciendo el procedimiento y guías a seguir en sus propias subastas. Ello, siempre y cuando el estatuto habilitador le delegue la facultad.

La Ley de la Autoridad de Carreteras y Transportación, 9 LPRA 2001, et seq., incorpora la política pública anteriormente delineada

---

[5] En el presente caso, por ejemplo, a la primera subasta comparecieron cinco (5) postores, mientras que a la segunda sólo dos (2). Cabe destacar además, que en la segunda subasta se adjudicó el proyecto por $13,912,828.44. Ello costó al Pueblo de Puerto Rico por lo menos la suma adicional de $468,111.56, pues la licitación de RBR fue de $13,444,717.00.

al disponer los parámetros a tenor con los cuales deben reglamentarse

las subastas de la ACT:

> El Secretario de Transportación y Obras Públicas y el
> Director Ejecutivo establecerán administrativamente los
> procedimientos y guías que habrán de regir los procesos de
> las subastas negociadas, <u>a los fines de obtener el mayor
> número de licitadores, promover la competencia entre éstos y
> mantener la confidencialidad del proceso de negociación
> anterior a la adjudicación</u>. (Énfasis suplido.)

Los reglamentos que rigen el procedimiento de subasta para la ACT

fueron adoptados en virtud del mandato de ley antes citado. Por lo

tanto, deben ser interpretados de forma cónsona con los objetivos de

política pública delineados por la legislatura en el estatuto orgánico

que delegó a la ACT el poder de reglamentar sus subastas.

La ACT, aprobó dos reglamentos que resultan pertinentes para

resolver la controversia ante nos. De un lado están las Disposiciones

Generales de las Especificaciones Estándar para la Construcción de

Carreteras y Puentes de 1989 (en adelante las Disposiciones

Generales)[6]. Éstas regulan el proceso de apertura de la subasta,

enumeran fundamentos que obligan a la Junta a rechazar licitaciones y

establecen que la Junta podrá rechazar licitaciones de forma

discrecional cuando ello beneficie "los mejores intereses" de la ACT.

De otro lado, el Reglamento de Subasta Formal de la Autoridad de

Carreteras (en adelante el Reglamento) establece las facultades y

responsabilidades en torno a la adjudicación y anulación de subastas.

Examinemos primero las disposiciones pertinentes a la anulación de

subastas.

A. La Anulación

El Reglamento, establece la responsabilidad de la Junta de hacer

una recomendación de anulación de subasta <u>fundamentada</u>[7] al Director.

---

[6] Éstas se encuentran en el idioma inglés y se conocen como: General
Provisions of the Highway Authority Standard Specifications for Road
and Bridge Construction of 1989.

Sin embargo, será este último quien tomará la determinación final de anular o adjudicar.[8] Al Director, además, se le reserva el derecho de cancelar la adjudicación de una subasta en cualquier momento antes de formalizar el contrato sin que ello conlleve penalidad o responsabilidad alguna para la Autoridad. Véase, Art. VIII (A)(5) del Reglamento.

Esta reserva de derecho del Director justifica, según la ACT y el foro apelativo, la anulación de la subasta en controversia. Además, el Tribunal de Circuito interpreta que las disposiciones antes citadas relevan a la ACT de cualquier responsabilidad por los daños que puedan sufrir los licitadores en casos de anulación. No les asiste la razón.

Si bien es cierto, que estas disposiciones confieren al Director de la ACT discreción para anular una subasta en cualquier momento antes de la formalización del contrato, ello no implica que el ejercicio de este derecho esté exento de responsabilidad. Los derechos no pueden ejercerse de forma irrazonable, ni en el vacío. Toda anulación de subasta tendrá que fundamentarse y expresar cómo dicha actuación beneficia a los mejores intereses de la ACT.

Tanto el abuso de derecho, como su ejercicio arbitrario podrán ser fuente de responsabilidad. En Velilla v. Pueblo Supermarkets, 111 D.P.R. 585 (1981), señalamos al respecto,

> Es ilegítimo el ejercicio de un derecho cuando el titular excede manifiestamente los límites impuestos por la buena fe o por el fin social de ese derecho.

El fin social perseguido por la reserva del derecho a rechazar las licitaciones o a cancelar la subasta una vez adjudicada es permitir a la autoridad un grado de discreción y flexibilidad que le permita

---

[7] El Art. VIII(B)(1) reza:

B. Anulación de subasta
1. De la junta recomendar que se anule una subasta bajo consideración, **deberá indicar la razón o razones para tal acción** y, además, recomendará al Director una de las siguientes alternativas…

[8] El Art. VIII (A)(5) dispone: La adjudicación o anulación de toda subasta será hecha por el Director.

proteger sus intereses adecuadamente. Esto es, la discreción debe utilizarse para la consecución de los objetivos expresados en el estatuto orgánico de la ACT, a saber: (1) obtener el mayor número de licitadores; (2) promover la competencia; y (3)mantener confidencial el proceso de licitación. Sólo en relación a estos fines, o en protección de algún otro interés apremiante del Pueblo de Puerto Rico, puede ejercerse la discreción administrativa delegada para anular una subasta válidamente adjudicada. Lo contrario sería permitir el abuso y la arbitrariedad.

Como fundamento para la anulación de la subasta la Junta cita la omisión de la lectura en voz alta de los precios unitarios de las tres proposiciones más bajas. Alega ante nos la ACT, que dicha lectura es un "requisito reglamentario", no obstante, omite citar la disposición legal que apoya esta contención. Aunque nos percatamos de que las Disposiciones Generales exigen que la Junta abra y lea en voz alta <u>las propuestas</u>[9], no encontramos regla alguna que obligue a la Junta a leer específicamente <u>los precios unitarios por partida de los tres licitadores más bajos</u>.

Tampoco encontramos que la omisión de esta lectura deba conllevar la anulación de la subasta. En ausencia de una explicación de cómo dicha omisión afecta los intereses de la ACT, el trato justo a los licitadores o la adecuada adjudicación de la subasta, encontramos que el fundamento citado por la Junta para anular resulta irrazonable y arbitrario. Abusó de su discreción la Junta al anular la subasta.


B.   Notificación

Ahora bien, en el presente caso hay un segundo elemento que brinda apoyo a la determinación de arbitrariedad. La Junta, al comunicar la anulación a los licitadores, ni siquiera les explicó los motivos para esta decisión. Peor aún, se rehusó a proveerlos posteriormente cuando RBR los solicitó. ¿Es válida legalmente esta

notificación?  Entendemos que no.  ¿Está la agencia obligada a proveer explicaciones a los licitadores?  Resolvemos que sí.

Según el Reglamento, una vez el Director ha tomado la decisión de anular una subasta, corresponde al Presidente de la Junta notificar a los licitadores.  Dicho deber se encuentra plasmado en el Art. VIII(A)(7) de la siguiente forma:

> El Presidente de la Junta tendrá la responsabilidad de notificar por escrito a los licitadores participantes en la subasta la decisión tomada por el Director.  (Énfasis suplido.)

Ciertamente la disposición antes citada no exige a la Junta notificar a los licitadores los fundamentos que tuvo para recomendar la anulación.  Interpretada literalmente, pareciera que bastaría notificarles la determinación de anular.  Tampoco le son de aplicación a las subastas los requisitos para procedimientos adjudicativos formales establecidos en el Capítulo III de la L.P.A.U.

No obstante, las subastas son procedimientos informales sui géneris que gozan de ciertas características adjudicativas.  Por tanto, le son de aplicación los principios generales establecidos en la Sec. 3.16 de la L.P.A.U.  En particular, la referida sección dispone:

> Si la agencia concluye o decide no iniciar un procedimiento adjudicativo en un caso particular, terminará el procedimiento y notificará por escrito por correo certificado con acuse de recibo a las partes su determinación, los fundamentos para la misma y el recurso de revisión disponible. 3 L.P.R.A. sec. 2166.  (Énfasis suplido.)

Para que el derecho a obtener la revisión judicial de la decisión sea uno efectivo, es imprescindible exigir que la notificación de la decisión, además de informar la disponibilidad y plazo para solicitar reconsideración o revisión, esté fundamentada, aunque sea de forma sumaria.  Por tanto, resolvemos que los principios generales establecidos en la sección antes citada son aplicables a los procedimientos de subasta, aunque éstos sean de naturaleza informal.

---

[9] Véase sección 102.13.

¿De qué otra forma podremos los tribunales revisar si la decisión de anular respondía "a los mejores intereses" de la ACT?   ¿Cómo asegurarnos de que no fue irrazonable, arbitraria o caprichosa la decisión?

No solo nos parece irrazonable y sospechoso el fundamento de la Junta para anular, sino que la notificación a los licitadores fue totalmente inadecuada.  Avalar la legalidad de una notificación como la de autos es convertir el trámite de revisión administrativa en una gestión fútil; en un recurso sin significado sustantivo.  Si la parte afectada desconoce las razones que tuvo la Junta para anular, no tendrá fundamentos para cuestionar su proceder.  Los fundamentos para anular, además de ser necesarios para preparar un adecuado recurso de reconsideración o revisión, son información pública que debió ser provista a RBR sino en la notificación de anulación, cuando menos una vez se le solicitó a la Junta formalmente.

C.   Rechazo de la licitación de RBR

Por último, examinamos el rechazo de la propuesta de RBR.  Se adujo como fundamento en que en la fianza de subasta se omitió la fecha de la subasta.

Las disposiciones reglamentarias de la ACT contemplan tanto el rechazo mandatorio de propuestas, como el discrecional.  La Sec. 102.4 de las disposiciones generales, enumera las instancias en que la Junta está obligada a rechazar una licitación.  Entre las razones establecidas, se encuentra el no incluir un seguro de fianza **aceptable**.[10]  No encontramos en el reglamento que el omitir la fecha de

---

[10] En la carta dirigida a RBR, la Junta citó el incumplimiento con las Secs. 102.07 y 102.11 de las disposiciones generales como fundamento para el rechazo de su oferta.  Sin embargo, la carta de la Junta a la Administración Federal de Autopistas explica que el rechazo de la propuesta de RBR se debió a que se presentó un seguro de fianza incompleto en violación a la Sec. 102.14 inciso a(5).

subasta en el seguro de fianza constituya una deficiencia insubsanable o que dicha deficiencia invalide un seguro de fianza o lo haga inaceptable.

La omisión de la fecha de subasta en el documento de fianza en este caso particular, a nuestro juicio, constituye una deficiencia totalmente inocua e insustancial que difícilmente podría justificar el rechazo de una licitación que cumpla con el resto de los requisitos. Especialmente, en vista de que (1) la fianza había sido válidamente emitida por una compañía aseguradora aprobada por el Comisionado de Seguros de Puerto Rico; (2) se describía con precisión la obra a afianzada; (3) se emitió por la cantidad requerida; (4) la ACT había obviado esta omisión en ocasiones anteriores; y (5) la propia ACT admite en su carta a FHA que se trata de una deficiencia subsanable.

Nuevamente, la ausencia de una explicación razonable sobre cómo el rechazo de la licitación de RBR por omitir la fecha de subasta en el seguro de fianza responde a los mejores intereses de la autoridad, nos vemos forzados a concluir que el rechazo fue arbitrario. Sobre todo, cuando el seguro cumplía con todos los requisitos sustantivos. Cabe enfatizar que la propia Junta admitió en su carta a FHA que dicha omisión fue una mínima y de carácter subsanable.

Los tribunales tenemos el deber de asegurar que al efectuar sus gestiones de compra y contratación, las instrumentalidades públicas cumplen con la ley, con sus propios procedimientos y que tratan de forma justa a los licitadores. En fin, que los dineros del pueblo se gastan en beneficio del interés público. No debemos perder de

---

Hemos estudiado cuidadosamente las tres secciones, y sólo esta última resulta pertinente al rechazo de la licitación ante nos. Sobre el rechazo mandatorio de licitaciones, la sección dispone:

    102.14     Rejection of Proposals and Disqualification of Bidders
         a.    The Board of Awards will reject a proposal for any of the following irregularities:
             (1)…
             (2)…
             (3)…
             (4)…

perspectiva que el gobierno es el comprador y contratante más grande del país.  La adecuada fiscalización de la utilización de los dineros del erario público resulta de vital importancia para mantener la confianza del ciudadano en el gobierno y una democracia saludable.

Si bien es cierto que debemos gran deferencia a las determinaciones de las agencias administrativas, cuando éstas no se encuentran sustentadas por evidencia sustancial en el récord o cuando son irrazonables, nada nos impide intervenir.  Nos encontramos ante una determinación arbitraria cuando es infundada o irrazonable.  La ausencia total de fundamentos razonables, tanto para anular la subasta como para rechazar la propuesta de RBR, nos fuerza a concluir que nos encontramos ante unas decisiones arbitrarias, producto de un procedimiento plagado de irregularidades.

Por los fundamentos que preceden, se expide el auto de certiorari, revocando tanto la sentencia emitida por el Tribunal de Circuito de Apelaciones, como la dictada por el Tribunal de Primera Instancia y se devuelve el caso al foro de instancia para que continúen los procedimientos de forma compatible con lo aquí resuelto.

Se dictará Sentencia de conformidad.


MIRIAM NAVEIRA DE RODÓN
Juez Asociada

---

(5)  If the proposal does not include an acceptable proposal guaranty.

EL TRIBUNAL SUPREMO DE PUERTO RICO


RBR Construction, S.E.

    Peticionario

       v.

                             CC-1996-351

Autoridad de Carreteras y
Transportación de P.R. y su
Junta de Subasta


    Recurrida


SENTENCIA


San Juan, Puerto Rico, a 22 de diciembre de 1999


    Por los fundamentos que preceden en la anterior Opinión, revocamos tanto la sentencia emitida por el Tribunal de Circuito de Apelaciones, como la dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan.

    Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. Los Jueces Asociados señores Rebollo López y Fuster Berlingeri concurren con el resultado sin opinión escrita. El Juez Asociado señor Corrada del Río hace constar que disiente por entender que el dictamen del Tribunal de Circuito de Apelaciones es sustancialmente correcto.


                        Isabel Llompart Zeno
                Secretaria del Tribunal Supremo